LEAVENWORTH, LAWRENCE, AND GALVESTON RAILROAD
COMPANY *v.* UNITED STATES.

1. Where rights claimed under the United States are set up against it, they must be so clearly defined that there can be no question of the purpose of Congress to confer them.

2. The rule announced in the former decisions of this court, that a grant by the United States is strictly construed against the grantee, applies as well to grants to a State to aid in building railroads as to one granting special privileges to a private corporation.

3. The doctrine in *Wilcox* v. *Jackson*, 13 Pet. 498, that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, although no exception be made of it, reaffirmed and held to apply with more force to Indian, than to military, reservations, inasmuch as the latter are the absolute property of the government, whilst in the former other rights are vested.

4. Where Congress enacts " That there be and is hereby granted " to a State, to aid in the construction of a specified railroad, " every alternate section of land, designated by odd numbers," within certain limits of each side of the road, the State takes an immediate interest in land, so situate, whereto the complete title is in the United States at the date of the act, although a survey of the land and a location of the road are necessary to give precision to the title and attach it to any particular tract. Such a grant is applicable only to public land owned absolutely by the United States. No other is subject to survey and division into such sections.

5. Where the right of an Indian tribe to the possession and use of certain lands, as long as it may choose to occupy the same, is assured by treaty, a grant of them, absolutely or *cum onere*, by Congress, to aid in building a railroad, violates an express stipulation ; and a grant in general terms of " land " cannot be construed to embrace them.

6. A proviso, that any and all lands heretofore reserved to the United States, for any purpose whatever, are reserved from the operation of the grant to which it is annexed, applies to lands set apart for the use of an Indian tribe under a treaty. They are *reserved to the United States for that* specific use; and, if so reserved at the date of the grant, are excluded

from its operation. It is immaterial whether they subsequently become a part of the public lands of the country.

7. The act of March 3, 1863 (12 Stat. 772), to aid in the construction of certain railroads in Kansas, embraces no part of the lands reserved to the Great and Little Osages by the treaty of June 2, 1825 (7 Stat. 240); and the treaty concluded Sept. 29, 1865, and proclaimed Jan. 21, 1867 (14 Stat. 687), neither makes nor recognizes a grant of such lands. The effect of the treaty is simply to provide that any rights of the companies designated by the State to build the roads should not be barred or impaired by reason of the general terms of the treaty, but not to declare that such rights existed.

8. The act of Congress of even date with said act (12 Stat. 793), authorizing treaties for the removal of the several tribes of Indians from the State of Kansas, and for the extinction of their title, and a subsequent act for relocating a portion of the road of the appellant (17 Stat. 5), neither recognize nor confer a right to the lands within the Osage country.

APPEAL from the Circuit Court of the United States for the District of Kansas.

This is a bill, filed by the United States against the Leavenworth, Lawrence, and Galveston Railroad Company, to establish its title to certain tracts of land lying within the Osage country in Kansas, which were certified to the Governor of Kansas as forming part of the grant made by Congress to that State, to aid in the construction of certain railroads. The court granted the prayer of the bill, and the company appealed.

The treaty with the Great and Little Osage tribes of Indians of June 2, 1825 (7 Stat. 240), contains the following provision : —

ARTICLE II. " Within the limits of the country above ceded and relinquished, there shall be reserved to and for the Great and Little Osage tribe or nation aforesaid, so long as they may choose to occupy the same, the following described tract of land."

The land embraces, with other tracts, that mentioned in the first article of a treaty with those Indians, which was concluded Sept. 29, 1865 (14 Stat. 687). That article is as follows : —

" The tribe of the Great and Little Osage Indians, having now more lands than are necessary for their occupation, and all payments from the government to them under former treaties having ceased, leaving them greatly impoverished, and being desirous of

improving their condition by disposing of their surplus lands, do hereby grant and sell to the United States the lands contained within the following boundaries. . . . And, in consideration of the grant and sale to them of the above-described lands, the United States agree to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians in the treasury of the United States; and interest thereon at the rate of five per centum per annum shall be paid to said tribe semi-annually, in money, clothing, provisions, or such articles of utility as the Secretary of the Interior may from time to time direct. Said lands shall be surveyed and sold under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws [including any act granting lands to the State of Kansas, in aid of the construction of a railroad through said lands], but no pre-emption claim or homestead settlement shall be recognized ; and, after reimbursing the United States the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, the remaining proceeds of sales shall be placed in the treasury of the United States, to the credit of the " civilization fund," to be used, under the direction of the Secretary of the Interior, for the education and civilization of Indian tribes residing within the limits of the United States."

The words in brackets are an amendment adopted by the senate, 26th June, 1866, which the Indians accepted Sept. 21 of that year. The treaty was proclaimed Jan. 21, 1867.

On the 3d of March, 1863, Congress passed " An Act for a grant of lands to the State of Kansas, in alternate sections, to aid in the construction of certain railroads and telegraphs in said State " (12 Stat. 772) ; the first section of which is as follows : —

" That there be, and is hereby, granted to the State of Kansas, for the purpose of aiding in the construction : *First*, of a railroad and telegraph from the city of Leavenworth, by way of the town of Lawrence, and *viâ* the Ohio City crossing of the Osage River, to the southern line of the State in the direction of Galveston Bay, in Texas; with a branch from Lawrence by the valley of the Wakarusa River, to the point on the Atchison, Topeka, and Santa Fé Railroad where said road intersects the Neosho River. *Second*, of a railroad from the city of Atchison, *viâ* Topeka, the capital of

said State, to the western line of the State, in the direction of Fort Union and Santa Fé, New Mexico ; with a branch from where this last-named road crosses the Neosho, down said Neosho Valley to the point where the said first-named road enters the said Neosho Valley; every alternate section of land, designated by odd numbers, for ten sections in width on each side of said road and each of its branches. But in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section, or any part thereof, granted as aforesaid, or that the right of pre-emption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purpose aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections or parts of sections, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the right of pre-emption or homestead settlements have attached as aforesaid; which lands, thus indicated by odd numbers and selected by the direction of the Secretary of the Interior as aforesaid, shall be held by the State of Kansas for the use and purpose aforesaid : *Provided,* that the land to be so selected shall in no case be located further than twenty miles from the lines of said road and branches : *Provided further,* that the lands hereby granted for and on account of said road and branches, severally, shall be exclusively applied in the construction of the same, and for no other purpose whatever ; and shall be disposed of only as the work progresses through the same, as in this act hereinafter provided : *Provided, also,* that no part of the land granted by this act shall be applied to aid in the construction of any railroad or part thereof, for the construction of which any previous grant of land or bonds may have been made by Congress : *And provided further,* that any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said road and branches through such reserved lands ; in which case the right of way only shall be granted, subject to the approval of the President of the United States."

The legislature of Kansas, on the 9th of February, 1864, passed an act accepting the grant; and designated the appellant to build the road from Leavenworth to the southern line of the State, and to receive the grant of land upon the prescribed terms and conditions. Its authorized route passed through the Osage lands whereof mention is made in the first article of the treaty of 1865, and a map of the definite location of the road was filed in the General Land-Office, Jan. 2, 1868.

The Commissioner of the General Land-Office, by letter bearing date Jan. 21, 1868, directed the register and receiver of the proper office to withdraw from sale the odd-numbered sections within ten miles of the line of the road.

The fourth section of the law making appropriations for the Indian Department, approved March 3, 1863 (12 Stat. 793), is as follows : —

" That the President of the United States be, and is hereby, authorized to enter into treaties with the several tribes of Indians, respectively, now residing in the State of Kansas, for the extinction of their titles to lands held in common within said State, and for the removal of such Indians of said tribes as hold their lands in common to suitable localities elsewhere within the territorial limits of the United States, and outside the limits of any State."

On the 10th of April, 1869, Congress passed the following joint resolution (16 Stat. 55) : —

" *Resolved, by the Senate and House of Representatives of the United States of America, in Congress assembled,* That any *bona fide* settler residing upon any portion of the lands sold to the United States by virtue of the first and second articles of the treaty concluded between the United States and the Great and Little Osage tribe of Indians, September twenty-ninth, eighteen hundred and sixty-five, and proclaimed January twenty-first, eighteen hundred and sixty-seven, who is a citizen of the United States, or shall have declared his intention to become a citizen of the United States, shall be, and hereby is, entitled to purchase the same, in quantity not exceeding one hundred and sixty acres, at the price of one dollar and twenty-five cents per acre, within two years from the passage of this act, under such rules and regulations as may be prescribed by the Secretary of the Interior : *Provided, however,* that both the odd and even numbered sections of said lands shall

be subject to settlement and sale as above provided : *And provided further*, that the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for State school purposes, in accordance with the provisions of the act of admission of the State of Kansas: *Provided, however*, that nothing in this act shall be construed in any manner affecting any legal rights heretofore vested in any other party or parties."

Settlers made entries lying within the odd-numbered sections, which were set aside and vacated, Jan. 16, 1872, by the Secretary of the Interior, who decided that the appellant had a grant within those lands.

The appellant having constructed its road from its initial point to Thayer, within the ceded territory, and about twenty miles south of its northern boundary ; and, desiring to change its previously located route south of that town, the legislature of Kansas, in January, 1871, asked Congress to allow a relocation of the road.

Congress passed an act, approved April 19, 1871, as follows (17 Stat. 5) : —

" An Act to enable the Leavenworth, Lawrence, and Galveston Railroad Company to relocate a portion of its road.

" *Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled*, That the Leavenworth, Lawrence, and Galveston Railroad Company, for the purpose of improving its route and accommodating the country, may relocate any portion of its road south of the town of Thayer, within the limits of its grant, as prescribed by the act of Congress entitled ' An Act for a grant of lands to the State of Kansas, in alternate sections, to aid in the construction of certain railroads and telegraphs in said State,' approved March third, eighteen hundred and sixty-three ; but not thereby to change, enlarge, or diminish said land grant."

Sept. 21, 1871, the Governor of Kansas certified to the Secretary of the Interior that the road of the appellant had been constructed and equipped as required by the act of Congress of March 3, 1863, and that a map of the road had been duly filed, whereupon certified lists of the odd-numbered sections of lands within the railroad limits were made by the proper authority at Washington, and the governor, April 8, 1872, and March 21,

1873, issued to the appellant patents for the lands mentioned in the bill of complaint.

The case was argued by *Mr. George F. Edmunds* and *Mr. P. Phillips* for the appellant, and by *Mr. Solicitor-General Phillips*, *Mr. Jeremiah S. Black*, and *Mr. William Lawrence*, for the appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

This bill was brought by the United States to confirm and establish its title to certain tracts of land, and to enjoin the appellant from setting up any right or claim thereto. These tracts, situate within the Osage ceded lands in Kansas, and specifically described in " certified lists " furnished by the Commissioner of the General Land-Office, with the approval of the Secretary of the Interior, to the governor of the State, were subsequently conveyed by the latter to the appellant. Having the force and effect of a patent (10 Stat. 346), the lists passed the title of the United States to the tracts in question, if they were embraced by the grant in aid of the construction of the appellant's road. But the appellee contends that they were not so embraced. If such be the fact, inasmuch as public officers cannot bind the government beyond the scope of their lawful authority, the decree of the Circuit Court granting the prayer of the bill must be affirmed.

The act of Congress of March 3, 1863 (12 Stat. 772), is the starting-point in this controversy. Upon it and the treaty with the Great and Little Osage Indians, proclaimed Jan. 21, 1867 (14 id. 687), the appellant rests its claim of title to the lands covered by the patents. It is, therefore, of primary importance to ascertain the scope and meaning of that act. The parties differ radically in their interpretation of it. The United States maintains that it did not dispose of the Osage lands, and that it was not intended to do so. On the contrary, the appellant insists that, although not operating upon any specific tracts until the road was located, it then took effect upon those in controversy, as they, by reason of the extinction of the Osage title in the mean while, had become, in the proper sense of the term, public lands. This difference would seem to imply obscurity in the act; but, be this as it may, the rules which govern in the interpretation of legislative grants are so well

settled by this court that they hardly need be reasserted. They apply as well to grants of lands to States, to aid in building railroads, as to grants of special privileges to private corporations. In both cases the legislature, prompted by the supposed wants of the public, confers on others the means of securing an object the accomplishment of which it desires to promote, but declines directly to undertake.

The main question in *The Dubuque and Pacific Railroad Company* v. *Litchfield*, 23 How. 66, was, whether a grant to the Territory of Iowa, to aid in the improvement of the navigation of the Des Moines River, extended to lands above the Raccoon Fork, or was confined to those below it. The court, in deciding it, say, —

"All grants of this description are strictly construed against the grantee ; nothing passes but what is conveyed in clear and explicit language ; and, as the rights here claimed are derived entirely from the act of Congress, the donation stands on the same footing of a grant by the public to a private company, the terms of which must be plainly expressed in the statute, and, if not thus expressed, they cannot be implied."

This grant, like that to Iowa, was made for the purpose of aiding a work of internal improvement, and does not extend beyond the intent it expresses. It should be neither enlarged by ingenious reasoning, nor diminished by strained construction. The interpretation must be reasonable, and such as will give effect to the intention of Congress. This is to be ascertained from the terms employed, the situation of the parties, and the nature of the grant. If these terms are plain and unambiguous, there can be no difficulty in interpreting them ; but, if they admit of different meanings, — one of extension, and the other of limitation, — they must be accepted in a sense favorable to the grantor. And if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of Congress to confer them. In other words, what is not given expressly, or by necessary implication, is withheld.. *Dubuque and Pacific Railroad Company* v. *Litchfield, supra ; Rice* v. *Railroad Company*, 1 Black, 380 ; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 120. Applying these rules to this controversy, there does not seem to be any difficulty in deciding it. Whatever is included in the

exception is excluded from the grant; and it therefore often becomes important to ascertain what is excepted, in order to determine what is granted. But, if the exception and the proviso were omitted, the language used in the body of this act cannot be construed to include the Osage lands.

It creates an immediate interest, and does not indicate a purpose to give in future. "There be and is hereby granted" are words of absolute donation, and import a grant *in præsenti.* This court has held that they can have no other meaning; and the land department, on this interpretation of them, has uniformly administered every previous similar grant. *Railroad Company* v. *Smith,* 9 Wall. 95; *Schulenberg* v. *Harriman,* 21 id. 60; 1 Lester, 513; 8 Opin. 257; 11 id. 47. They vest a present title in the State of Kansas, though a survey of the lands and a location of the road are necessary to give precision to it, and attach it to any particular tract. The grant then becomes certain, and by relation has the same effect upon the selected parcels as if it had specifically described them. In other words, the grant was a float until the line of the road should be definitely fixed. But did Congress intend that it should reach these lands? Its general terms neither include nor exclude them. Every alternate section designated by odd numbers, within certain defined limits, is granted; but only the public lands owned absolutely by the United States are subject to survey and division into sections, and to them alone this grant is applicable. It embraces such as could be sold and enjoyed, and not those which the Indians, pursuant to treaty stipulations, were left free to occupy. *Rice* v. *Railroad Co., supra.* Since the land system was inaugurated, it has been the settled policy of the government to sell the public lands at a small cost to individuals, and for the last twenty-five years to grant them to States in large tracts to aid in works of internal improvement. But these grants have always been recognized as attaching only to so much of the public domain as was subject to sale or other disposal, although the roads of many subsidized companies pass through Indian reservations.

Such grants could not be otherwise construed; for Congress cannot be supposed to have thereby intended to include land previously appropriated to another purpose, unless there be an express declaration to that effect. A special exception of it

was not necessary; because the policy which dictated them confined them to land which Congress could rightfully bestow, without disturbing existing relations and producing vexatious conflicts. The legislation which reserved it for any purpose excluded it from disposal as the public lands are usually disposed of; and this act discloses no intention to change the long-continued practice with respect to tracts set apart for the use of the government or of the Indians. As the transfer of any part of an Indian reservation secured by treaty would also involve a gross breach of the public faith, the presumption is conclusive that Congress never meant to grant it.

"A thing which is within the letter of the statute is not within the statute, unless it be within the intention of the makers." 1 Bac. Abr. 247. The treaty of June 2, 1825, secured to the Osages the possession and use of their lands "so long as they may choose to occupy the same;" and this treaty was only the substitute for one of an earlier date with equal guaranties.

As long ago as *The Cherokee Nation* v. *Georgia*, 5 Pet. 1, this court said that the Indians are acknowledged to have the unquestionable right to the lands they occupy, until it shall be extinguished by a voluntary cession to the government; and, recently, in *United States* v. *Cook*, 19 Wall. 591, that right was declared to be as sacred as the title of the United States to the fee. Unless the Indians were deprived of the power of alienation, it is easy to see that they could not peaceably enjoy their possessions with a dominant race constantly pressing on their frontier. With the ultimate fee vested in the United States, coupled with the exclusive privilege of buying that right, the Indians were safe against intrusion, if the government discharged its duty to them. This it has indicated a willingness to do; for in 1834 an act was passed (4 Stat. 729, sect. 11) prohibiting, under heavy penalties, a settlement on the lands of an Indian tribe, or even an attempt to survey them. This perpetual right of occupancy, with the correlative obligation of the government to enforce it, negatives the idea that Congress, even in the absence of any positive stipulation to protect the Osages, intended to grant their land to a railroad company, either absolutely or *cum onere*. For all practical purposes, they owned it; as the actual right of possession, the

only thing they deemed of value, was secured to them by treaty, until they should elect to surrender it to the United States. In the free exercise of their choice, they might hold it for ever; and whatever changed this condition, or interfered with it, violated the guaranties under which they had lived. The United States has frequently bought the Indian title, to make room for civilized men, — the pioneers of the wilderness; but it has never engaged in advance to do so, nor was constraint, in theory at least, placed upon the Indians to bring about their acts of cession. This grant, however, if it took effect on these lands, carried with it the obligation to extinguish the Indian right. This will be conceded, if a complete title to them were granted; but it is equally true if only the fee subject to that right passed. It would be idle to grant what could be of no practical benefit unless something be done which the grantee is forbidden, but which the grantor has power, to do. And this applies with peculiar force to a grant like this, intended to be immediately available to the grantee. The lands were expected to be used in the construction of the road as it progressed; but they could neither be sold nor mortgaged so long as a valid adverse right of occupancy attached to them. The grantee was prohibited from negotiating with the Indians at all; but the United States might, by treaty, put an end to that right. As Congress cannot be supposed to do a vain thing, the present grant of the fee would be an assurance to the grantee that the full title should be eventually enjoyed. This would be in effect a transfer of the possessory right of the Indians before acquiring it, — a poor way of observing a treaty stipulation. How could they treat on an equality with the United States under such circumstances? They would be constrained to sell, as the United States was obliged to buy. Although it might appear that the sale was voluntary, it would, in fact, be compulsory. Can the court, in the absence of words of unmistakable import, presume that an act so injurious to the Indians was intended? The grant is silent as to such a purpose; but if it was to take effect in the Osage country, on the surrender of the Indian title, it would have so declared. It is true the recognized route of the road passed through that country; but many other roads, aided by similar grants, ran through such reservations, and in no case before this has land included in them been considered

as falling within any grant, whether the Indian right was extinguished before or after the definite location of the road. And if Congress really meant that this grant should include any part of the reservation of the Osages, it would at least have secured an adequate indemnity to them, and sanctioned a delay in locating the road until the surrender of their right should be made. Instead of this, the act contains no provision for them, and contemplates that the road shall be finished as soon as practicable. This is inconsistent with a purpose to grant their land; for they had not proposed to relinquish it, nor had the President encouraged them to do so. In the face of this, it is hard to believe that Congress meant to hold out inducements to the company to postpone fixing the route of their road until a contingency should happen which the act did not contemplate. Besides, Congress was bound by every consideration affecting the condition of the Indians to retain their lands within its own control. But it is said that the Indian appropriation bill became a law the same day as the act under consideration, and that it authorized the President to enter into negotiations with the several tribes of Indians residing in Kansas, for the extinction of their title and for their removal. This is true; but it does not prove any purpose inconsistent with the policy of the act of 1837 (5 Stat. 135), which contemplates the sale of all Indian lands ceded to the government. If Congress had intended to extinguish the Osage title, for the benefit of the appellant, it would have spoken directly, as it did in the Pacific Railroad act, and not in an indirect way near the end of one of the general appropriation bills. The Congress that made this grant made one, eight months before, to aid in the construction of a railroad from the Missouri River to the Pacific Ocean, and of other roads connecting therewith; in which it agreed to extinguish as rapidly as possible the Indian title, for the benefit of the companies. This was necessary, although their roads ran through territory occupied by wild tribes; but this passed through a reservation secured by treaty, and occupied by Indians at least partially civilized. A transfer of any part of it would be wrong; and, as the act does not mention it, there is no reason to suppose that Congress, in making the grant, contemplated the extinction of the Indian title at all. Besides, the avowed object of the

provision in the appropriation act was to remove the Indians. If any ulterior hidden purpose was to be thereby subserved, Congress is not responsible for it, nor can it affect this case. The language used is to be taken as expressing the legislative intention, and the large inference attempted to be drawn from it is not authorized. It does not follow, because Congress sanctioned negotiations to effect the removal of the Indians from Kansas, as a disturbing element of her population, and to procure their land for settlement, that it also contemplated obtaining the title of any tribe in order to convey it by this grant. The policy of removal — a favorite one with the government, and always encouraged by it — looked to the extinguishment of the Indian title for the general good, and not for the special benefit of any particular interest. But the two acts have no necessary connection with each other, because they happened to be approved on the 3d of March. The laws signed by the President that day occupy one hundred pages of the twelfth volume of the statutes.

We are not without authority that the general words of this grant do not include an Indian reservation. In *Wilcox* v. *Jackson*, 13 Pet. 498, the President, by proclamation, had ordered the sale of certain lands, without excepting therefrom a military reservation included within their boundaries. The proclamation was based on an act of Congress supposed to authorize it; but this court held that the act did not apply, and then added, " We go further, and say, that whenever a tract of land shall have been once legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands; and that no subsequent law, proclamation, or sale would be construed to embrace or operate upon it, although no reservation were made of it." It may be urged that it was not necessary in deciding that case to pass upon the question; but, however this may be, the principle asserted is sound and reasonable, and we accept it as a rule of construction. The supreme courts of Wisconsin and Texas have adopted it in cases where the point was necessarily involved. *State* v. *Delesdenier*, 7 Tex. 76; *Spaulding* v. *Martin*, 11 Wis. 274. It applies with more force to Indian than to military reservations. The latter are the absolute property of the government; in the former, other rights are vested. Congress cannot be supposed to grant them by a subsequent law,

general in its terms. Specific language, leaving no room for doubt as to the legislative will, is required for such a purpose.

But this case does not rest alone on the words of description in the grant; for the Osage lands are expressly excepted by force of the following proviso: —

"That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, *or for any other purpose whatsoever*, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said road and branches through such reserved lands; in which case, the right of way only shall be granted, subject to the approval of the President of the United States."

In construing a public grant, as we have seen, the intention of the grantor, gathered from the whole and every part of it, must prevail. If, on examination, there are doubts about that intention or the extent of the grant, the government is to receive the benefit of them. This proviso has, in our opinion, no doubtful meaning. Attached in substantially the same form to all railroad land-grant acts passed since 1850, it was employed to make plainer the purpose of Congress to exclude from their operation lands which, by reason of prior appropriation, were not in a condition to be granted to a State to aid it in building railroads. It would be strange, indeed, if, by such an act, Congress meant to give away property which a just and wise policy had devoted to other purposes. That lands dedicated to the use of the Indians should, upon every principle of natural right, be carefully guarded by the government, and saved from a possible grant, is a proposition which will command universal assent. What ought to be done, has been done. The proviso was not necessary to do it; but it serves to fix more definitely what is granted by what is excepted. All lands "heretofore reserved," that is, reserved before the passage of the act, "by competent authority, for any purpose whatsoever," are excepted by the proviso. This language is broad and comprehensive. It unquestionably covers these lands. They had been reserved by treaty before the act of 1863 was passed. It is said, however, that having been reserved,

not " to the United States," but to the Osages, they are, there-fore, not within the terms of the proviso. This position is untenable. It would leave the proviso without effect; because all the reservations through which this road was to pass were Indian. This fact was recognized, and the right of way granted through them, subject to the approval of the President. Through his negotiations with the Indians, he secured it in season for the operations of the company. Besides, there were no other lands over which he could exercise any authority to obtain that right. And why grant it by words vesting its immediate enjoyment, unless it was contemplated that the roads would be constructed during the existence of those reservations? But the verbal criticism, that these lands were not, within the meaning of this proviso, reserved " to the United States," is unsound. The treaty reserved them as much to one as to the other of the contracting parties. Both were interested therein, and had title thereto. In one sense, they were reserved to the Indians; but, in another and broader sense, to the United States, for the use of the Indians.

Every tract set apart for special uses is reserved to the government, to enable it to enforce them. There is no differ-ence, in this respect, whether it be appropriated for Indian or for other purposes. There is an equal obligation resting on the government to require that neither class of reservations be diverted from the uses to which it was assigned. Out of a vast tract of land ceded by the Osages, a certain portion was retained for their exclusive enjoyment, as long as they chose to possess it. The government covenanted that they should not be disturbed, except with their voluntary consent first obtained ; and a grant of their land would be such a manifest breach of this covenant, that Congress, in order to leave no possible room for doubt, specially excepted it by the proviso. A construction which would limit it to land set apart for military posts and the like, and deny its application to that appropriated for Indian occupation, is more subtle than sound. This proviso, or rather one couched in the same language, was the subject of consideration by this court, and received a liberal interpretation, instead of the technical and narrow one claimed for it by the appellant.   *Wolcott* v. *Des Moines Navigation Co.*, 5 Wall. 681,

was a controversy concerning the title to certain lands, which, it was conceded, were covered by a grant, unless excluded by the proviso thereunto annexed. The court held that they were excluded, although they had not been reserved " to the United States." They had been, in fact, reserved by the executive officers of the government, upon a mistaken construction of a prior grant made by the United States to the State of Iowa. This decision was reaffirmed in *Williams* v. *Baker*, 17 id. 144.

The scope and effect of the act of 1863 cannot, in our opinion, be mistaken. The different parts harmonize with each other, and present in a clear light the scheme as an entirety. Kansas needed railroads to develop her resources, and Congress was willing to aid her to build them, by a grant of a part of the national domain, in a condition at the time to be disposed of. It was accordingly made of alternate sections of land within ten miles on each side of the contemplated roads. Formerly, lands which would probably be affected by a grant were, as soon as it was made, if not in advance of it, withdrawn from market. But experience proved that this practice retarded the settlement of the country, and at the date of this act the rule was not to withdraw them until the road should be actually located. In this way, the ordinary working of the land system was not disturbed. Private entries, pre-emption, and homestead settlements, and reservations for special uses, continued within the supposed limits of the grant, the same as if it had not been made. But they ceased when the routes of the roads were definitely fixed; and if it then appeared that a part of the lands within those limits had been either sold at private entry, taken up by pre-emptors, or reserved by the United States, an equivalent was provided. The companies were allowed to select, under the direction of the Secretary of the Interior, in lieu of the lands disposed of in either of these ways, an equal number of odd sections nearest to those granted, and within twenty miles of the line of the road. Having thus given lands in place and by way of indemnity, Congress expressly declared, what the act already implied, that lands otherwise appropriated when it was passed were not subject to it.

The indemnity clause has been insisted upon. We have before said that the grant itself was *in præsenti*, and covered

all the odd sections which should appear, on the location of the road, to have been within the grant when it was made. The right to them did not, however, depend on such location, but attached at once on the making of the grant. It is true they could not be identified until the line of the road was marked out on the ground; but, as soon as this was done, it was easy to find them. If the company did not obtain all of them within the original limit, by reason of the power of sale or reservation retained by the United States, it was to be compensated by an equal amount of substituted lands. The latter could not, on any contingency, be selected within that limit; and the attempt to give this effect to the clause receives no support, either in the scheme of the act or in any thing that has been urged by counsel. It would be strange, indeed, if the clause had been intended to perform the office of making a new grant within the ten-mile limit, or enlarging the one already made. Instead of this, the words employed show clearly that its only purpose is to give sections beyond that limit, for those lost within it by the action of the government between the date of the grant and the location of the road. This construction gives effect to the whole statute, and makes each part consistent with the other. But, even if the clause were susceptible of a more extended meaning, it is still subject to, and limited by, the proviso which excludes all lands reserved at the date of the grant, and not simply those found to be reserved when the line of the road shall be definitely fixed. The latter contingency had been provided for in the clause; and, if the proviso did not take effect until that time, it would be wholly unnecessary. And these lands being within the terms of the proviso, as we construe it, it follows that they are absolutely and unconditionally excepted from the grant; and it makes no difference whether or not they subsequently became a part of the public lands of the country.

But the appellant claims that these lands were subjected to this grant by virtue of the senate amendment to the Osage treaty, concluded Sept. 29, 1865, and proclaimed in 1867. If the amendment has this effect, it is entirely inconsistent with the purposes of the treaty. The United States had not made an absolute or a contingent grant of the lands. There was,

manifestly, no reason why the Osages should bestow a gratuity on the appellant; and the treaty itself, as originally framed, disclaims such an intention. Whatever they did give was limited to persons from whom they had received valuable services, and they so expressly stated. Their annuities had ceased. Confessed poverty, and the desire to improve their condition, induced them to negotiate. They had a surplus of land, but no money. The United States, in pursuance of a long-settled policy, desired to open that land to settlement. Induced by these considerations, the parties concluded a treaty, which was submitted to the senate for its constitutional action. By the first article the Osages ceded, on certain conditions, a large and valuable part of their possessions. The United States was required to survey and sell it on the most advantageous terms, for cash, in conformity with the system then in operation for surveying and selling the public lands, with the restriction that neither pre-emption claims nor homestead settlements were to be recognized. The proceeds, after deducting enough to repay advances and expenses, were to be placed in the treasury to the credit of the "civilization fund," for the benefit of the Indian tribes throughout the country.

The moneys arising from the sale of the lands ceded by the second article were for the exclusive benefit of the Osages; but the relation of the United States to the property in each case is the same. And it can make no difference that the trust in one is specifically set forth, and in the other is to be ascertained from the general scope of the language. It is an elementary principle, that no particular form of words is necessary to create a trust. In neither case is the government a beneficiary. In both, the fund is to be applied to promote the well-being of the Indians, which it has ever been the cherished policy of Congress to secure.

Neither party contemplated that a part of the lands was to be given to a corporation, to aid in building a railroad. And, if the appellant gets any of them, it is manifest that the treaty cannot be carried into effect, nor can the trusts therein limited and declared be executed. As neither the act of 1863 nor the treaty in its original shape grants the tracts in controversy, the inquiry presents itself as to the effect of the amendment.

The provision on this subject, with the amendment in brackets, reads as follows : —

" Said lands shall be surveyed and sold under the direction of the Secretary of the Interior, on the most advantageous terms for cash, as public lands are surveyed and sold under existing laws [including any act granting lands to the State of Kansas in aid of the construction of a railroad through said lands] ; but no pre-emption claim or homestead settlement shall be recognized."

Tested by its literal meaning and grammatical structure, this amendment relates solely to the survey and sale of the lands, and cannot be extended further.   It was doubtless so explained to the Indians when they accepted it.   But obscure as it is, and indefinite as is its purport, it was intended to do more than declare what laws should be observed in surveying and selling the lands.   But whatever purpose it was meant to serve, it obviously does not, *proprio vigore*, make a grant.   To do this, other words must be introduced; but treaties, like statutes, must rest on the words used, — " nothing adding thereto, nothing diminishing."   In *Rex* v. *Barrell*, 12 Ad. & Ell. 468, Patteson, J., said, " I see the necessity of not importing into statutes words which are not found there.   Such a mode of interpretation only gives occasion to endless difficulty."   Courts have always treated the subject in the same way, when asked to supply words in order to give a statute a particular meaning which it would not bear without them.   *Rex* v. *Poor Law Comm'rs*, 6 Ad. & Ell. 7; *Everett* v. *Wells*, 2 Scott (N. C.), 531; *Green* v. *Wood*, 7 Q. B. 178.

It is urged that the amendment, if it does not make a grant, recognizes one already made.   It does not say so; and we cannot suppose that the senate, when it advised and consented to the ratification of the treaty with that among other amendments, intended that the Indians, by assenting to them, should recognize a grant that had no existence.   Information was, doubtless, communicated to that body, that there were grants of some of the ceded lands which might interfere with the absolute disposal of them required by the treaty.   If there were such grants, it was obviously proper that the treaty should be so modified as not to conflict with rights vested under them.   But the senate left that question to the proper tribunal; and

declared, in effect, that such grants, if made by existing laws, should be respected in the disposition of the lands. On this interpretation, the amendment in question is consistent with the treaty. But if that contended for by the appellant be correct, the treaty is practically defeated. If no such grant had been made, lands would be taken from the Osages without either their consent or that of Congress, and appropriated to building railroads; for no one can fail to see that interested outside parties, having access to these ignorant Indians, would explain the amendment as a harmless thing. In concluding the treaty, neither party thereto supposed that any grant attached to the lands; for, as we have seen, all were to be sold, and the fund invested. Did the senate intend to charge them with a grant, whether it had really been made or not? If so, the treaty would have been altered to conform to so radical a change in its essential provisions, by excepting the lands covered by the grant instead of directing them to be sold. Why sell *all*, if the *status* of a part was fixed absolutely by the amendment? In such a case, justice to the companies required that they should have the lands granted to them. The United States should, also, to this extent, be relieved of its trust. But, if the amendment was designed to operate only in the contingency that a grant had been made, there was no occasion to alter the treaty further than to say, as it now substantially does say, that the companies, if entitled to the lands, should get them. No objection could justly be made to such a provision. It preserved vested rights, but did not create new ones. Without solving the problem whether or not a grant had been made, it decided that the rights of the companies, if any they had, should not be barred or impaired by reason of the general terms of the treaty. It is argued that the Osages are not injured by taking a portion of their country, as an enhanced value would be given to the remainder by the construction of the appellant's road. This is taking for granted what may or may not be true. Besides, they cannot be despoiled of any part of their inheritance upon such a fallacious pretence, and they chose to have *all* their lands sold. To this the United States assented by positive stipulation. We do not think that it was the intent of the amendment to annul that stipulation,

or to construe statutes upon which the title of the appellant depends. Its office was to protect rights that might be asserted, independently of the treaty, but not to declare that any such rights existed.

The Thayer Act, as it is called, is invoked; but it can have no effect upon this case. It was passed for the sole purpose of enabling the company to relocate its road; and a false recital in it cannot turn the authority thereby given into a grant of lands or a recognition of one. Especially is this so, when it expressly leaves the rights of the appellant to be determined by previous legislation. Besides this, these lands were then selling under a joint resolution; and it cannot be presumed that the Congress of 1871 intended to change the disposition of them, directed by the Congress of 1869.

It is urged that parties have loaned money on the faith that the lands in question were covered by the grant.

This is a subject of regret, as is always the case when a title, on the strength of which money has been advanced, fails. It is to be hoped that the security taken upon the other property of the company will prove to be sufficient to satisfy the claims of the holders of its bonds. But whether this be so or not, we need hardly say that the title to lands is not strengthened by giving a mortgage upon them; nor can the fact that it has been given throw any light upon the prior estate of the mortgagor.

Upon the fullest consideration we have been able to bestow upon this case, we are clearly of opinion that there is no error in the record.    *Decree affirmed.*

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE SWAYNE and MR. JUSTICE STRONG, dissenting.

I do not agree with the majority of the court in this case. In my judgment, the land in controversy passed by the grant of Congress to the State of Kansas, and by the patents of the State to the defendant. In reliance upon the title conferred, a large portion of the money was raised with which the road of the company was built. I cannot think that the legislation of Congress, and the subsequent action in conformity to it of the Department of the Interior and of the State of Kansas, deceived both company and creditors.

The act of Congress appears to me to be singularly plain and free from obscurity. " There be and is hereby granted to the State of Kansas," are the words used, for the purpose of aiding in the construction of a railroad and telegraph between certain places, alternate odd sections of land along each side of the road and its branches. These words were sufficiently comprehensive to pass whatever interest the United States possessed in the lands. If there were any limitation upon their operation, it lay either in the character of the property granted, as lands in the occupation of Indian tribes, or in the subsequent reservations of the act.

The road with which the present company is concerned was to be constructed through the tract situated in the southern part of the State, known as the Osage reservation. Upon this tract the Osage tribes of Indians resided under the treaty of June 2, 1825, by which the tract was reserved to them so long as they might choose to occupy it. 7 Stat. 240. The fee of the land was in the United States, with the right of occupation, under the treaty, in the Indians. Until this right was relinquished, the occupancy could not be disturbed by any power except that of the United States. The only right of Indian tribes to land anywhere within the United States is that of occupancy. Such has been the uniform ruling of this court; and upon its correctness the government has acted from its commencement. In *Fletcher* v. *Peck*, which was here as long ago as 1810, it was suggested by counsel on the argument that the power of the State of Georgia to grant did not extend to lands to which the Indian title had not been extinguished; but Mr. Chief Justice Marshall replied, that the majority of the court were of opinion that the nature of the Indian title, which was certainly to be respected until legitimately extinguished, was not such as to be absolutely repugnant to seisin in fee on the part of the State. 6 Cranch, 121, 142, 143.

In *Clark* v. *Smith*, 13 Pet. 200, decided many years afterwards, Mr. Justice Catron, speaking of grants made by North Carolina and Virginia of lands within Indian hunting-grounds, said that these States " to a great extent paid their officers and soldiers of the Revolutionary war by such grants, and extinguished the arrears due the army by similar means. It was one

of the great resources that sustained the war, not only by these States, but others.   The ultimate fee encumbered with the Indian right of occupancy was in the crown, previous to the Revolution, and in the States of the Union afterwards, and subject to grant."

And in the recent case of the *United States* v. *Cook*, where replevin was brought for timber cut and · sold by Indians on lands reserved to them, the court said that the fee of the land was in the United States, subject only to a right of occupancy in the Indians; that this right of occupancy was as sacred as that of the United States to the fee; but it was "only a right of occupancy," and "that the possession, when abandoned by the Indians, attaches itself to the fee without further grant." 19 Wall. 593. ·

It would seem, therefore, clear that there was nothing in the character of the land as an Indian reservation which could prevent the operation of the grant of Congress, subject to the right of occupancy retained by the Indians; so that, when this right should be relinquished, the possession would inure to the grantee.

It is true that the United States, acting in good faith, could only acquire the relinquishment of the Indian right of occupancy by treaty; and so the authors of the bill for the grant understood.   The representative of Kansas in the Senate of the United States, by whom the bill was introduced, preceded its presentation with a notice of his intention to introduce at the same time a bill for extinguishing the Indian title in Kansas, and the removal of the Indians beyond her borders.   The two bills were introduced within a few days of each other; and both became a law on the same day.   The one for the extinguishment of the Indian title was incorporated into the appropriation bill, and authorized the President to enter into treaty for that purpose with the several tribes of Indians then residing in the State, and for their own removal beyond its limits. Pursuant to this authority, a treaty was subsequently made with the Osage Indian tribes; and, before the line of the road of the defendant company was definitely fixed, their right of occupancy to the lands in controversy was extinguished.

I proceed to the next inquiry: Was there any thing in the

reservations of the act which limited the operation of the general words of grant? There were two reservations in the act, — one general and the other special, the latter being in the proviso. The general reservation only excepted from the operation of the grant lands which, at the time the line of the road and its branches was definitely fixed, were sold or reserved, or to which the right of pre-emption or homestead settlement had then attached.

The sections granted could only be ascertained when the route of the road was established; but, as this might take years, the government did not in the mean time withhold the lands from settlement and sale upon any notion that the route might possibly pass through or near them. It kept the lands generally open to the settler or pre-emptor, and subject at all times to appropriation for public uses; and the object of the general reservation mentioned was to provide for the possible acquisition of interests in this way to lands falling within the limits of the grant. When they did so fall, other lands in their place were to be selected. It was only when the route was definitely fixed that the right of sale or settlement or reservation ended, and the title previously floating attached to the land subject to the grant. This was the construction adopted by the land department, and was the one which most fully fitted in with the general policy of the government in other cases in the disposition of the public lands.

In 1856 the question arose before the Department of the Interior as to the construction of a similar provision in the act of Congress of May 15 of that year, granting lands to the State of Iowa, and was submitted to the then attorney-general, Cushing; and he replied that the act contemplated that the United States should retain power to convey within all the possible limits of the grant, either by ordinary sale or on pre-emption, up to the time when the lines or routes of the road were definitely fixed. 8 Op. Att'y-Gen. 246.

Whilst the operation of the grant may, on the one hand, be thus limited by what occurs subsequent to the act, it may, on the other hand, be enlarged by subsequent removal of existing impediments; such as reservations, contracts of sale, and initiatory steps for acquiring rights of pre-emption and homestead

settlement.  The question in either case respects the condition of the land at the time the line or route of the road is definitely fixed.  If a previous reservation, whether existing before the act or made afterwards, be then relinquished, or a previous contract of sale or right of pre-emption or homestead settlement be then abandoned, the grant will, in my judgment, take the land.  Such I understand to be the ruling of the land department; and it is difficult to perceive any reasons of public policy which should prevent the land in such cases from passing under the grant.

The special reservation contained in the proviso to the act in terms applies only to lands reserved *to* the United States. There have been, from the outset of the government, reservations of lands for public uses of various kinds, through which a right of way for a public highway or railroad might well be granted, subject to the approval of the President, who would see that the property was not injured.  To protect lands thus situated, or lands reserved to the government for similar public purposes, the proviso applied.  The lands now in controversy, occupied by the Osage Indians, were set apart to them: they were not reserved *to* the United States in any sense in which those terms can be properly used.

The treaty of 1825, under which the lands were held, distinguishes between reservations *to* the Indians and reservations *to* the United States, and speaks of both in the same article (art. 2).

The argument of the majority of the court on this head appears to me to defeat itself.  The proviso, it is contended, excluded from the operation of the grant any of the lands occupied by the Indians: it would have been a great breach of faith, it is said, to apply the grant to any of those lands.  But at the same time, it is admitted that the act contemplated a right of way through those lands for the road.  It is difficult to perceive how taking the lesser quantity of the land for a right of way, if done without treaty, could have been any less a breach of faith; and, if done by treaty, the taking might as well have extended to the whole lands.  As the Congress which made the grant also authorized the President to obtain an extinguishment of the right of occupancy from the Indians, it would seem that there ought not to be any greater reproach

in providing for the acquisition of the lands, than in providing for the acquisition of the right of way.

But, aside from this consideration, if the conclusion were at all doubtful, which I do not think it is, there is a rule applicable to the construction of provisos in a grant, which should determine the question here; and that is, that they must be strictly construed. In *United States* v. *Dixon*, Mr. Justice Story stated, that it was "the general rule of law, which has always prevailed and become consecrated almost as a maxim in the interpretation of statutes, that where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception must establish it as being within the words as well as within the reason thereof." 15 Pet. 165. I submit confidently that the proviso here thus construed would not take the lands in controversy out of the enacting clause of the act.

The proviso itself is a formula used in nearly all land-grants; and is inserted out of abundant caution, even where there are no special reservations on which it can operate. But in this case there was the military reservation at Fort Gibson, which would have passed under the grant but for the proviso.

There is, then, in my judgment, nothing in the reservations contained in the act which should prevent the operation of the granting words upon the lands within the Osage reservation. But, were there any doubt whether the act was intended to cover these Indian lands, that doubt would be removed by the recognition of the grant in the treaty with the Indians and the subsequent legislation of Congress. The treaty was adopted on the 29th of September, 1865. Stat. 687, 692. It provided that, in consideration of the sale of the lands, the United States should pay $300,000, to be placed to the credit of the Indians in the treasury of the United States; and should pay interest thereon in money, clothing, provisions, and such articles of utility as the Secretary of the Interior might from time to time direct. And it declared, as originally drawn, that the lands should be surveyed and sold as public lands are surveyed and sold under existing

laws. But, when the treaty was under consideration by the Senate, it was amended in this particular, so as to conform to the act granting the lands to Kansas. That act provided that the alternate sections reserved from the grant, within ten miles of the road or its branches, should be sold at double the minimum price of the public lands. The amendment inserted in the treaty added, immediately after the provision for the survey and sale under existing laws, the words "including any act granting lands to the State of Kansas in aid of the construction of a railroad through said lands;" so that the provision required that the sale of the lands of the Osage Indians should be made in accordance with existing laws, including among them the one granting lands to Kansas. Here is a clear recognition that that act was intended to cover the Indian lands. This recognition was not limited merely to the senate; for the attention of both houses of Congress was called to the subject by the appropriation which the treaty required and Congress made.

Again: in January, 1871, Congress passed an act authorizing the company, for the purpose of improving its route and accommodating the country, to relocate any portion of its road south of the town of Thayer, within the limits of its grant as prescribed by the act of Congress. The town of Thayer was situated within the boundaries of the Osage lands. The act also declared, that the company should not thereby — that is, by the relocation — change, enlarge, or diminish the land-grant; and this declaration is held by the majority of the court to destroy the effect of the act as a recognition of the grant of the Indian lands. How it does so I am unable to see. When it declares that the company may alter its road south of a particular point within the limits of its grant, the act does admit that the company has a grant, and that the grant lies south of that point; and this admission is not affected by the further declaration that the company shall not thereby change, enlarge, or diminish the grant.

But I will not pursue the subject further. The conclusion reached by the court appears to me to work great injustice. The government of the United States, through one set of its officers, after mature deliberation and argument of counsel, has issued its certificates or lists, that the lands in controversy were

covered by the grant, and has thus encouraged the expenditure of millions of money in the construction of a public highway, by which the wilderness has been opened to civilization and settlement; and then, on the other hand, after the work has been done and the money expended, has, with another set of officers and all the machinery of the judiciary, attempted to render and has succeeded in rendering utterly worthless the titles it aided to create and put forth upon the world. Such proceedings are not calculated, in my judgment, to enhance our ideas of the wisdom with which the law is administered, or of the justice of the government.

I am of opinion that the decree should be reversed.

NOTE. — *Missouri, Kansas, and Texas Railway Company* v. *United States*, appeal from the Circuit Court of the United States for the District of Kansas, is, in its essential features, the same as the preceding case, and was argued by the same counsel.

MR. JUSTICE DAVIS delivered the opinion of the court.     The decision in *Leavenworth, Lawrence, and Galveston Railroad Company* v. *United States, supra,* p. 733, controls this case. Each company claims a grant of land within the Osage reservation. This case involves substantially the same questions as the other; with this difference, that the act of July 25, 1866 (14 Stat. 289), under which the appellant claims, was passed after the amendment had been advised by the senate, and the treaty was beyond its control.

In any aspect of this case, the appellant cannot recover. The amendment refers only to existing laws, and does not apply to the act of 1866, as it was not then in force. It is true that the bill, which subsequently became a law, was pending at the same time as the treaty ; but if the senate intended the amendment to apply not only to existing but to contemplated grants, language appropriate to such a purpose would have been used. This remark applies to Congress also; for if it meant, notwithstanding the provisions of the treaty, to grant these lands, words would have been employed to include them, or at least take them out of the proviso. But the result is the same, whether the act is to be treated as taking effect before or after the treaty became operative by the proclamation of the President on the 21st of January, 1867. If it was in force for all purposes on the day it passed, then the Indian title even was not extinguished, as the treaty had not been ratified. But if it be considered as in any sense taking effect after the ratification, then the claim of the appellant is defeated by the terms of the treaty. These lands, having been thereby set apart to be surveyed and sold for the benefit of the Indians, were " otherwise appropriated," as much as they had been before the treaty was concluded, and were consequently reserved within the meaning of the excepting clause in the act.

*Decree affirmed.*

MR. JUSTICE SWAYNE, MR. JUSTICE FIELD, and MR. JUSTICE STRONG dissented.