WILLIAM P. SPALDING v. WILLIAM CHANDLER.

*Public lands—Pre-emption—Indian reservation.*

1. The Indian reserve at Sault Ste. Marie was not subject to pre-emption under the pre-emption law of 1841, even after the surrender by the Chippewa Indians to the United States, August 2, 1855, of the rights secured to them therein under the treaty of June 16, 1820; the government having seen fit to exempt Indian reservations from the provisions of said pre-emption act, even after the Indian title was extinguished.

2. The rights secured to the Chippewa Indians under the treaty of June 16, 1820, in the Indian reserve at Sault Ste. Marie, was a *perpetual* one, and when said reserve was set apart and appropriated to their use for a place of encampment, the land could not be thereafter used or occupied by any one else while they accepted and used it, and all of the beneficial attributes and belongings of the fee were theirs, as far as any use of the same was concerned.

3. The fact that a parcel of land embraced within the Indian reserve at Sault Ste. Marie was at one time within the so-called "Military Reservation," or at least surrounded by it, did not alter its character, or take away or destroy the right of the Indians to its use for the purposes for which it was set apart and reserved; nor could Congress by naming the land as a "military reservation" in the act of Congress of August 26, 1852, granting the right of way to the State of Michigan for the canal at Sault Ste. Marie, or by any other legislation, directly or indirectly, destroy the reservation after it had been set apart to and used by the Indians under the treaty of 1820; the voluntary cession of the land to the United States by the Indians themselves being necessary to deprive it of its character as an Indian reservation. *Railroad Co. v. U. S.*, 92 U. S. 733, 742.

Appeal from Chippewa. (Grant, J.) Argued November 11 and 12, 1890. Decided December 24, 1890.

Bill to declare the title to a portion of the Indian reserve at Sault Ste. Marie, patented to the defendant, to

belong to complainant under a prior pre-emption under the pre-emption law of 1841. Complainant appeals from a decree dismissing his bill. Decree affirmed. The facts are stated in the opinion.

*Lawrence F. Bedford (Brennan & Donnelly,* of counsel), for complainant.

*John H. Goff,* for defendant.

Morse, J. This controversy involves the title to a parcel of land near Sault Ste. Marie, in this State, a part of what was once termed the "Indian Reserve."

The complainant claims title under a pre-emption entry of one Byron B. Adsit. The proofs show that Adsit moved upon the land in 1856 or 1857, and built a house upon it, and raised some garden vegetables. He proved up his claim before the register and receiver of the land-office at Marquette, and December 5, 1859, received from these officers a certificate describing the land covered by his entry as follows:

"Lot designated on the map of the United States survey in the land-office at Marquette, Mich., as 'Indian Reserve,' subject to all the provisions, requirements, and conditions of an act of Congress entitled 'An act granting to the State of Michigan the right of way, and a donation of public lands, for the construction of a ship-canal around the falls of the Ste. Marie, in said State,' approved August 26, 1852, of section No. six, in township No. 47 north, of range No. 1 east, containing 36 50-100 acres, at the rate of $1.25 per acre."

This certificate stated that, in pursuance of law, Adsit had, on that day, purchased the above described premises, and would be entitled to a patent for the same upon his presentation of such certificate to the General Land-office at Washington. He was also given a receipt for the money paid therefor. On the same day, the local land-officers at Marquette wrote the Commissioner of the

General Land-office, stating that they had examined Adsit's proofs of his pre-emption claim—

"To what is designated 'Indian Reserve' in section six, township 47 north, of range one east, containing 36 50-100 acres, and find that the same was originally reserved for Indian purposes; that it was surveyed in 1845, and the contents ascertained, as appears by our maps; that the Indian claim and title was extinguished by the treaty of August 2, 1855, for reference to which, see 'Statutes at Large and Treaties of the United States of America, commencing with the first, session of the 34th Congress, 1855 and 1856,' page 37 of treaties, and which has since been complied with by the United States by payment to the Indians."

They recommended the allowance of Adsit's claim, considering the land subject to pre-emption and his proofs sufficient. To this letter, the acting Commissioner, John S. Wilson, replied of date February 8, 1860, referring the Marquette officers to his instructions of June 9, 1853, in which they were informed that section 6, among other lands, was within the military reservation of Ft. Brady. They answered, and called the attention of the Commissioner to the act of Congress of September 26, 1850, stating that, under such act, the military reserve had been reduced to about 40 acres, and did not include the lands in question, and referring him also to the map of private claims to be found in his office; and further stating that they knew of no reason why the land was not subject to pre-emption. April 9, 1860, Wilson again wrote them that, the land claimed by Adsit not being subject to pre-emption, his entry was canceled, and directing them to note such cancellation on their books and plats, and to notify Adsit to make the usual application for the repayment to him of his purchase money. No further effort was made by Adsit, or any one in his behalf, to obtain a patent upon his certificate, and no appeal was taken from the action of the Commissioner.

August 7, 1860, Adsit conveyed the land by quitclaim deed to the complainant.

The defendant claims title under a patent from the United States, dated December 15, 1883, issued to him, describing about 9.10¾ acres, which land is admitted to be within the limits of Adsit's pre-emption entry.

The complainant filed this bill November 22, 1888, asking that the title to the land described in said patent be decreed to be his by the prior and paramount right of his pre-emption, and that Chandler be directed to make a proper conveyance of the fee to him. It is admitted that the fee remained in the United States up to the issuing of the patent to Chandler, subject to the the pre-emption right of complainant. The circuit judge, Hon. C. B. Grant, sitting in the circuit court for the county of Chippewa, dismissed the complainant's bill upon the proofs, from which decree the complainant appeals.

The only right the complainant has is based upon the pre-emption of Adsit, and neither he nor the Court is concerned with the title of Chandler, as complainant had no possession of the premises when Chandler entered under his patent and occupied the land.

Several reasons are urged in this Court why the land in question was not subject to pre-emption at the time Adsit made his entry, and proved his claim before the local land-officers.

*First.* It is claimed that it was an Indian reserve, and, under the pre-emption law of 1841, by virtue of which Adsit made his entry, could not be pre-empted. Section 10 of said law of 1841, providing for the pre-emption of lands, contains the following provision:

"No lands reserved for the support of schools; nor the lands acquired by either of the two last treaties with the Miami tribe of Indians, in the state of Indiana, or which

may be acquired of the Wyandotte tribe of Indians, in the state of Ohio, *or other Indian reservation to which the title has been or may be extinguished by the United States at any time during the operation of this act;* no sections of land reserved to the United States alternate to other sections granted to any of the states for the construction of any canal, railroad, or other public improvement; no sections, or fractions of sections, included within the limits of any incorporated town; no portions of the public lands which have been selected as the site for a city or town; no parcel or lot of land actually settled and occupied for the purposes of trade, and not agriculture; and no lands on which are situated any known salines or mines,—shall be liable to entry under and by virtue of the provisions of this act." 5 U. S. Stat. 456.

The undisputed history of this so-called "Indian Reserve," at Sault Ste. Marie, of which this land was unquestionably a part, is as follows: June 16 1820, the Chippewa Indians ceded to the United States 16 square miles of land, designated by metes and bounds, reserving, however, rights of fishing and encampment, which were guaranteed to them as follows:

"The United States will secure to the Indians a perpetual right of fishing at the fall of St. Mary's, and also a place of encampment upon the tract hereby ceded, convenient to the fishing ground, which place shall not interfere with the defenses of any military work which may be erected. nor with any private rights." 7 U. S. Stat. 206.

March 28, 1836, the Ottawa and Chippewa Nations ceded to the United States a large tract of country, including within its limits the 16 square miles above mentioned. By article 3 of this treaty, the rights of the Indians were preserved in the following words:

"It is understood that the reservation for a place of fishing and encampment, made under the treaty of St. Mary's, of the 16th of June, 1820, remains unaffected by this treaty." 7 U. S. Stat. 492.

July 31, 1855, the said tribes released and discharged

the United States from all its obligations and liabilities under former treaties, and, in lieu thereof, accepted other grants and payments, exempting, however, from such relinquishments, the right of fishing and camping secured to them by the treaty of 1820. 11 U. S. Stat. 624.

August 2, 1855, the said Chippewa Indians of Sault Ste. Marie relinquished to the United States, for a valuable consideration, all their interests in this land, as follows:

" The said Chippewa Indians surrender to the United States the right of fishing at the falls of St. Mary's, and of encampment convenient to the fishing ground, secured to them by the treaty of June 16, 1820." 11 U. S. Stat. 631.

The land claimed by Adsit under his pre-emption was surveyed by the United States as a reservation for the Indians, and for a long time was treated as such, and Indians resided thereon in wigwams and log-houses until removed by the government. There is no doubt that this tract was set apart for the use of the Indians, and was used and occupied by the Chippewa Indians for encampment, under the reservation of 1820.

But it is claimed by the counsel for the complainant that, under the act of Congress of August 26, 1852, granting the right of way to the State of Michigan for the canal at Sault Ste. Marie, this land is termed and treated as a "Military Reserve" (see 1 Land Laws U. S. 1882, p. 218), and that under the act for settling claims at the Sault Ste. Marie, passed in September, 1850, the military reserve was reduced to its present limits; that it is apparent from the act of August 26, 1852, that, while this tract of 36 50-100 acres was devoted to the use of the Indians for fishing and camping, the appropriation of the land for such purposes was but a

84 MICH.—10.

temporary one, and the land was not regarded by the government as an Indian reserve, as contemplated by the pre-emption law of 1841, but as a military reserve in connection with the uses of Ft. Brady; that, therefore, the land was subject to Adsit's entry.

But the right given to these Indians by the treaty of 1820 was a "perpetual" one. There could be no stronger reservation. While the fee may have been vested in the United States of the whole of the 16 miles square, when this so-called "Indian Reserve" was set apart and appropriated to the use of these Indians for a place of encampment, the land certainly could not be used and occupied by any one else while they accepted and used it, and all the beneficial attributes and belongings of the fee were theirs, as far as any use of the same was concerned. And, after it was so set apart by the government, and accepted and occupied by the Indians, it is very doubtful if the United States could have changed the location of this reservation to some other point, without their consent. To have done so would have been a great moral wrong which only the doctrine that might makes right could have justified. But this was not attempted, and it remained such Indian reservation until it was relinquished by the apparently voluntary act of the Indians themselves. It cannot readily be seen that it differed in any material respect from other Indian reservations, except in this: that it was not in any sense lands that might be made available for agricultural purposes.

It is undoubtedly true that this reservation was included in the lands through which a right of way was granted by the act of August 26, 1852, but the only reference in the act to it is as to the whole grant, which speaks of "the public lands known as the 'Military Reservation of the Falls at St. Mary's River.'" This particular piece was at

one time within the so-called "Military Reservation," or at least surrounded by it, but this did not alter its character, or take away or destroy the Indian reservation, or the rights of the Indians to its use for the purposes for which it was set apart and reserved in the first place. And Congress by naming these lands as a "military reservation" in the act of August 26, 1852, or by any other legislation, directly or indirectly, could not destroy this Indian reservation, after it had been set apart to the Indians, and used by them, under the treaty of 1820. This piece of land could only be taken away from them, and deprived of its character as an Indian reservation, by its voluntary cession to the United States by the Indians themselves. *Railroad Co. v. U. S.*, 92 U. S. 733, 742, and cases cited.

The reason for the exemption of these lands, after the Indian title is extinguished, from pre-emption, is a good and substantial one, and in accord with the best public policy. The pre-emption law was a beneficent one, but it was not enacted for purposes of speculation, but to encourage actual and *bona fide* settlements upon the public lands. The reason is well stated by Mr. Justice Miller of the Supreme Court of the United States in *Root v. Shields*, 1 Woolw. at page 362, in speaking of the exemption from pre-emption of sections and fractions of sections included within the limits of any incorporated town:

"Whenever a town springs up upon the public lands, adjoining lands appreciate in value. The reasons are obvious, and the fact is well known. * * * So, too, in respect of lands which have been reserved for the use of an Indian tribe when the Indian title is extinguished, the same may be said. While such lands are held as a reserve, population flows up to their boundaries, and is there stayed. It, of course, constantly grows more and

more dense, so that, when the reserve is vacated, the lands have increased in value, and are always eagerly sought after."

It would, no doubt, under such circumstances, not be in the interest of the government, or of the whole people, to permit the pre-emption of these lands; nor yet the location of them by scrip, as was done by Chandler in this case. But, as before said, there need be no inquiry into Chandler's title here, if complainant's is not good. The government saw fit, in the pre-emption act of 1841, to exempt Indian reservations, even after the Indian title was extinguished, from the provisions of the act. If this land was not appropriated as an Indian reserve, under the treaty of 1820, at the time of the passage of the pre-emption law of 1841, it was certainly surveyed out and set apart as such as early as 1845, and it was, no doubt, used and treated as such before that time. But the act of 1841 covers all Indian reserves, whether set apart and designated as such before or after the passage of the act. It follows that Adsit could not pre-empt the land, and the complainant has no title to the premises.

The decree of the court below is affirmed, with costs.

CHAMPLIN, C. J., CAHILL and LONG, JJ., concurred. GRANT, J., did not sit.