BREWSTER, Atty. Gen., for and on Behalf of the UNITED STATES, *v.* KANSAS CITY, L. & S. K. RY. Co.[1]

*(Circuit Court D. Kansas.  September 3, 1885.)*

1. RAILROADS — LAND GRANTS — SEPARATE ACTS — ONE ROAD SECURING TWO GRANTS.

   When, by separate acts at different sessions of congress, lands are granted to two different corporations or parties to aid in building lines of road with the same general course or direction, by no arrangement between such corporations or parties can the building of only one road secure the benefits of both grants. Unless an intent to the contrary is plainly disclosed by the language of one or the other of the acts of congress, it will be presumed either that the later grant superseded the former, or else that the two roads must be built to earn the two grants.

2. SAME — MISSOURI, KANSAS & TEXAS RAILWAY COMPANY — NEOSHO VALLEY BRANCH — ACTS 1863 AND 1866 CONSTRUED.

   The Missouri, Kansas & Texas Railway Company, by the construction of a road from the Emporia down the Neosho valley, acquired no title to the grant of 1863 (1) because that act contemplated the construction of a branch down the Neosho valley of the main line running from Atchison southwesterly, and not the building of an independent road; (2) because the third proviso of section 1 limited the grant to the building of a road having no other grant; and (3) because it appears to have been the intention of congress to make the act of 1866 the sole land grant act for the road running through said valley.

In Equity.

*George R. Peck* and *C. F. Hutchings,* for the plaintiff and government.

*George W. McCrary* and *James Hagerman,* for defendant.

BREWER, J.  This is a proceeding in equity to set aside the patent to a body of land in southern Kansas.  There can be no question of the right of the government to maintain such a suit when either the ministerial officers have issued a patent for lands not subject to a patent, or not within the scope of the grants made by congress; (*U. S.* v. *Stone,* 2 Wall. 525; *Leavenworth, L. & G. R. Co.* v. *U. S.,* 92 U. S. 740;) or when such officers have been imposed upon by false and fraudulent representation.  *U. S.* v. *Minor,* 114 U. S. 233; S. C. 5 Sup. Ct. Rep. 836.  A case involving the title to the same lands was before the supreme court of Kansas when I was a member of that court, and the conclusion then reached was adverse to the title of the defendant here.  *Neer* v. *Williams,* 27 Kan. 1.  So far as any matters were considered by that court, I shall say nothing, but refer simply to the opinion I then wrote.  I see no reason to doubt the correctness of the views then expressed.  That case was submitted upon an agreed statement of facts, some of which are now not only not admitted, but vigorously and successfully disputed.  This change calls for an examination of certain questions not heretofore considered by me.  In view, however, of the similarity in many respects, and also of the further fact that the magnitude of the interests involved will inevitably

[1] Reversed.  See 7 Sup. Ct. Rep. 66.

Reported by Robertson Howard, Esq., of the St. Paul bar.

send this case to the court of last resort, I forbear any lengthy recital or discussion. I simply state very briefly the conclusion to which, upon the facts as they now appear, I have arrived.

The legal title must first be examined. That consists of a patent from the state of Kansas, dated May 19, 1873, based upon a certificate to the state from the commissioner of the general land-office. Both certificate and patent recite that the lands passed under the grant of March 3, 1863. Upon that act, therefore, rests the legal title. The beneficiaries of the two grants of that act were, as named by the state, the Leavenworth, Lawrence & Galveston Railroad Company and the Atchison, Topeka & Santa Fe Railroad Company. Of the first nothing need to be said, as nothing is claimed. To the second were granted lands for building a railroad from Atchison southwesterly, with a branch from its crossing of the Neosho, down the valley of the Neosho, to the point where the Leavenworth, Lawrence & Galveston Railroad should enter the valley. In July, 1864, a further grant was made to the state to aid in the building of a road from Emporia, the Atchison, Topeka & Santa Fe crossing of the Neosho, northwesterly to the Union Pacific road at or near Fort Riley. And again in July, 1866, an act was passed by congress granting directly to what is now known as the Missouri, Kansas & Texas Railroad Company lands to aid in building a road from Fort Riley southeasterly, and down the Neosho valley to the southern boundary of the state of Kansas. The line of this road was, therefore, for part of its distance, substantially the same as that of the branch of the Atchison, Topeka & Santa Fe above referred to. In March, 1866, the Atchison, Topeka & Santa Fe assigned its franchise and grant in respect to this branch to the Missouri, Kansas & Texas, and in January, 1867, this assignment was ratified by the state.

The Atchison, Topeka & Santa Fe never did anything towards building this branch, but the Missouri, Kansas & Texas constructed its entire road from Fort Riley down the Neosho valley. Could it claim any benefit of the grant to aid in building the branch? Generally speaking, I think it correct to say that when, by separate acts at different sessions of congress, lands are granted to two different corporations or parties to aid in building lines of road with the same general course or direction, by no arrangement between such corporations or parties can the building of only one road secure the benefits of both grants. Unless an intent to the contrary is plainly disclosed by the language of one or the other of the acts of congress, it will be presumed either that the later grant superseded the former, or else that the two roads must be built to earn the two grants. Such views accord with the rule that grants are to be construed in favor of the government and against the grantee, and also with the policy of the government to secure the public lands to actual settlers, except in those cases in which the importance of some public improvement justifies public aid.

But, beyond this general view, and sustaining it, may be noticed these facts : The act of 1863 provides for a "branch" down the Neosho valley, and not an independent cross-road. Perhaps it would be giving undue importance to the word "branch" to hold that its use concludes the question, and yet it is certainly significant of the intent of congress. Obviously that body contemplated a single trunk line running southwesterly through the state, with a branch down the Neosho valley, all under one management and control. Again, the third proviso to the granting section in the act of 1863 reads:

"Provided, also, that no part of the land granted by this act shall be applied to aid in the construction of any railroad, or part thereof, for the construction of which any previous grant of land or bonds may have been made by congress."

Now, the date from which the term "previous" relates may be the date of the act itself, or the time at which the state should name the beneficiary, or it may well be the time of the actual construction of the road. A positive determination of the date intended is unnecessary. All that I notice it for is because it emphasizes the intent of congress against the doubling of grants upon a single road. Still again, when the act of 1866 was before the senate for consideration, reference was made to the grant of 1863, and the tenor of the discussion shows that it was understood that the proposed act was to supersede all other acts, and to be the only living operative grant of lands to aid in building a road from the valley of the Neosho.

These are the principal considerations which impel to the conclusion that the Missouri, Kansas & Texas by building its road down the Neosho valley took nothing under the act of 1863. Of course, this destroys the legal title, for the act of 1863 alone provided for certification to the state. But it is earnestly insisted that, though the legal title may fail, yet equitably the Missouri, Kansas & Texas was entitled to the lands, and therefore equity will not interfere. Doubtless, if the premise is true, the conclusion will follow. This presents to my mind the most difficult question in the case, and one upon which I have slowly and hesitatingly come to a conclusion. I premise this as the correct rule applicable to this branch of the case. When the legal title fails, the defendant may defeat the action by proof that the equitable title to the very lands is with it, but not by proof that it had an unadjusted equitable claim upon the government for an equal quantity of unselected lands. The act of 1866, as heretofore stated, made a direct grant to the railroad company. It provided for patents from the government to it. It granted lands in place, and provided for indemnity lands to be selected by the secretary of the interior. The lands in controversy are not part of the lands in place, but are within the indemnity strip. Were they ever selected as indemnity lands under the act of 1866 ? Respondent claims that they were, but the evidence does not satisfy me of the fact, but rather indicates the contrary. It is true that in August, 1872, the Leaven-

worth, Lawrence & Galveston, and the Missouri, Kansas & Texas Companies filed a joint claim for these lands as indemnity lands, in which the former company claimed under the act of 1863, and the latter under both the acts of 1863 and 1866. But the commissioner of the general land-office recognized the claim as under the act of 1863 alone, and certified the lands to the state. This was done in April, 1873. But for the reasons given heretofore, I think the Missouri, Kansas & Texas Company had no valid, legal, or equitable claim under the act of 1863. But it is said that under the act of 1866 it did have a valid claim, and that the mistake of the commissioner in naming the statute does not destroy equitable rights. But how can it be inferred that the secretary of the interior would have recognized any claim under the act of 1866, or, recognizing it, made a selection of these lands in satisfaction thereof.

It does not seem to me that, under the testimony, it can be said that the commissioner would or ought to have selected these lands. Indeed, I cannot see how the company was entitled to so large a body of land as was in fact patented and certified to it. Counsel say that it was entitled to 819,200 acres at least, and received title to only 712,000. It may be true that it is all to which it has received a good title; but, beyond this, 270,970 acres of Osage ceded lands were patented or certified to it, and, at the time of this application and selection in 1872 and 1873, the title of the road thereto was, in the interior department at least, supposed to be perfect; for not until the October term, 1875, of the supreme court was the title to these lands declared void, and of the 712,000 acres to which it had a perfect title, no more than 86,000 acres were conveyed after such decision. So that whatever claim for the lands the company may now have, a claim which perhaps has recognized force only since the above decision, I do not think it can be said to have a valid equitable title to these lands, and the court may not take the place of the department and make a selection. As I said before, this part of the case presents the most doubtful and embarrassing question; but my conclusion is as above, and the decree must go as prayed for.