# STEWART *v.* UNITED STATES AND THE OSAGE NATION.

## APPEAL FROM THE COURT OF CLAIMS.

No. 256.    Argued April 12, 1907.—Decided May 13, 1907.

Under the Osage Indian treaty of September 29, 1865 and §§ 2237–2241, Rev. Stat., a register of the United States Land Office is not entitled to any additional compensation beyond the maximum of $2,500 per annum for services in connection with sales of land provided for by treaty.

Section 13 of the Act of Congress of May 3, 1903, 32 Stat. 1010, permitting registers and receivers to bring suit in the Court of Claims for commissions and compensation for sales of Osage Indian lands simply provided for presentation of the claims and for a decision on the merits without any admission that any sum was due or assumption that the claims were meritorious.

39 C. Cl. 321, affirmed.

THE appellant herein filed his petition in the Court of Claims to obtain compensation for services performed by him· while a register of the United States land office at Humboldt, in

the State of Kansas, during the time from May 12, 1869, until November 20, 1871.

His petition to recover for such services was filed in the Court of Claims pursuant to the provisions of section 13 of the Indian Appropriation Act (chapter 994), approved May 3, 1903 (32 Stat. 1010, 1011). The section reads as follows:

"SEC. 13. That any one or more of the registers and receivers of the United States land offices in the State of Kansas upon whom was imposed the responsibility of making sale and disposal of the Osage ceded, Osage trust and Osage diminished reserve land in said State under the treaty of September twenty-ninth, eighteen hundred and sixty-five, between the United States and the Osage Indians, and the acts of Congress for carrying said treaty into effect, may bring suit in the Court of Claims against the Osage Nation and the United States to determine the claim of the plaintiff or plaintiffs for commissions or compensation for the sale of said lands or any service or duty connected therewith. And the said court shall have jurisdiction to hear and determine said cause and to render judgment thereon on the merits; and the Attorney General shall appear on behalf of the United States and the Osage Nation, and either party feeling aggrieved at the decision of the Court of Claims may appeal to the Supreme Court of the United States, and the final judgment in such case shall determine the rights of all such registers and receivers similarly situated. Said Osage Nation may also appear in said suit by an attorney employed with the authority of said Nation. The Court of Claims shall have full authority, by proper orders and process, to make parties to any such suit all persons whose presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy."

The petition was dismissed on its merits by the Court of Claims (39 C. Cl. 321), and from such dismissal the appellant was allowed an appeal to this court. The following facts were found by the court:

The United States and the Great and Little Osage Indians

entered into a treaty September 29, 1865, which was pro-
claimed January 21, 1867.   14 Stat. 687.   In the first article
it was stated that the tribe of the Great and Little Osage In-
dians, having more land than was necessary for their occupa-
tion, and all payments by the Government to them under
former treaties having ceased, leaving them greatly impover-
ished, and being desirous of improving their condition by dis-
posing of their surplus land, they therefore granted and sold to
the United States the lands described in that article, and in
consideration of the grant and sale to them of such lands the
United States agreed to pay the Indians the sum of three
hundred thousand dollars, which sum was to be placed to the
credit of such Indians and interest thereon paid.   The lands
were to be surveyed and sold, under the direction of the Secre-
tary of the Interior, on the most advantageous terms, for cash,
as public lands are surveyed and sold under existing laws,
and after reimbursing the United States for the cost of such
survey and sale and the said sum of three hundred thousand
dollars advanced to the Indians the remaining proceeds of sales
were to be placed in the Treasury of the United States to the
credit of the "civilization fund," to be used under the direction
of the Secretary of the Interior.

By article 2 of the treaty the Indians also ceded to the United
States the tract of land therein described, in trust for the
Indians, to be surveyed and sold for their benefit by the Secre-
tary of the Interior under such rules and regulations as he
might from time to time prescribe, under the direction of the
Commissioner of the General Land Office, as other lands are
surveyed and sold.   Provision was then made in the article for
the proceeds arising from the sale.

By article 16 it was provided that if the Indians should re-
move from the State of Kansas and settle upon lands to be
provided for them by the United States in the Indian Territory,
on terms to be agreed upon, then the diminished reservation
should be disposed of by the United States in the same man-
ner and for the same purposes as thereinbefore provided in

relation to said trust lands, with exceptions not material to be noticed. (The Indians did subsequently remove from Kansas.)

It was also provided by the thirteenth article that, as the Indians had no annuities from which the expenses for carrying the treaty into effect could be taken, the United States should appropriate twenty thousand dollars, or so much thereof as might be necessary, for the purpose of surveying and selling the land thereby ceded in trust, which amount so expended was to be reimbursed to the Treasury of the United States from the proceeds of the first sales of the lands.

On the twenty-third of November and again on the nineteenth of December, 1867, the Commissioner of the General Land Office, by authority of the Secretary of the Interior, issued instructions to the registers and receivers in the State of Kansas for the rendition of services in the sale of land ceded to the United States by article 1 of the treaty above mentioned, and the lands agreed to be held in trust by the United States and surveyed and sold for the benefit of the said Indians by article 2 of that treaty. Among other instructions, under date of December 19, 1867, it was provided that the registers and receivers were to be "allowed a commission of one per cent. each on the proceeds of the sales of these lands, with limitations, as a matter of course, to the legal maximum of $2,500, inclusive of commissions and fees, etc., on the disposal of the public lands, the payment of which is to be made by the receiver, in his capacity of disbursing agent, and to be debited in a special account, together with such other expenses incident to the sale of the lands alluded to as may be authorized by law and instructions."

On the twenty-eighth of March, 1871, further instructions were given in regard to the performance of services, in which was the further statement that "nothing, however, shall be herein construed as authorizing the register and receiver to receive more than the maximum of $2,500 per annum, now allowed by law, and the receiver in adjusting his accounts will take care to first ascertain how much short of the maximum

the receipt from public lands, including the fees received from declaratory statements on the Osage lands, will bring their fees and commissions, and will then charge to the Indian fund only so much commissions as will bring their compensation to the maximum." In accordance with these instructions claimant performed services in the sale of lands ceded by the Osage Indians under article 1, and of lands held in trust by the United States under article 2 of the treaty, and of lands included within the diminished reservation of the Indians under article 16 of the treaty.

The claimant was paid for each year of his service the full maximum amount due him, in accordance with the instructions from the General Land Office. This full maximum would not in some cases have been reached without resort to the sales of land under the treaty. This suit has been brought by claimant to recover a commission of one per cent. on the amount of the sales of the land, and the filing fees on the lands mentioned in the treaty and now in the Treasury, as a reasonable compensation for his services in the sale of these lands as outside of and in addition to his regular official duties in the sale of public lands.

The total amount received on the sale of Osage ceded lands was $1,055,162.01; and the total amount received on sale of Osage trust and diminished reserve lands was $9,608,156.27; and the total amount of money held in trust by the Government for said Osage Indians under said treaty of September 29, 1865, is $8,327,439.07, on which interest at five per cent. is paid by the United States, amounting annually to $416,371.95.

Mr. *George A. King*, with whom Mr. *William B. King* and Mr. *R. V. Belt* were on the brief, for appellant:

The right of registers and receivers to a reasonable compensation for the sale of Indian lands under treaties similar to that of 1865 with the Great and Little Osage Indians has been settled and adjudicated by this court upon the basis that these additional services were performed for the benefit of the In-

dians and the statute implied the payment of a reasonable compensation for such services. *United States* v. *Brindle*, 110 U. S. 688; and see *United States* v. *Saunders*, 120 U. S. 126, 130. See also *Meigs* v. *United States*, 19 C. Cl. 497, 503, 504; *United States* v. *Rogers*, 81 Fed. Rep. 941.

The *Brindle case* has also been made a basis of action by Congress in legislation for the payment of claims of similar officers making sales of lands of Indians. See 27 Stat. 768, and 28 Stat. 580.

The instructions of the Secretary of the Interior so far as they related to the question of compensation contained not a proposal to the claimant to enter into a contract, but an official ruling and an erroneous one at that. Where officers of the Government in good faith comply with such rulings of their superior officers, they lose no rights by so doing. *United States* v. *Lawson,,* and *United States* v. *Ellsworth,* 101 U. S. 164, 170; *Swift Co.* v. *United States,* 111 U. S. 22, 29; *Robertson* v. *Frank Brothers Co.,* 132 U. S. 17, 23; *United States* v. *Mosby,* 133 U. S. 273, 279; *United States* v. *Post,* 148 U. S. 124, 133; *Glavey* v. *United States,* 182 U. S. 595.

The duties of a register of a land office refer exclusively to disposing of the public lands of the United States. Nothing in any statute required him to assist in disposing of private lands prior to the act of January 27, 1898.

Every presumption must be in favor of the payment of the officers performing this additional work out of the funds of the Indians for whose benefit the work was performed. It is not to be presumed that the treaty-making power, while inserting in the treaty a provision for payment of the expenses of the sale, intended that the treaty funds should escape the payment of all such expenses through the operation of a provision for the payment into the Treasury of the excess of the emoluments earned by the land officers in the performance of the regular duties of their offices. Such a provision was intended to operate under very different circumstances from those of the present case. Its purpose was to save the money

of the Government itself, not trust funds. *United States* v. *Bassett*, 2 Story, 389; *S. C.*, Fed. Cas., No. 14,539.

*Mr. Assistant Attorney General Van Orsdel* for the United States.

*Mr. Lorenzo A. Bailey* for the Osage Nation.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

Except for the treaty between the United States and the Osage Indians, relative to the lands in question, and the passage of appropriate legislation by the United States, the lands would never have been sold, as they were not public lands of the United States for the sale of which Congress had already provided under its general legislation. The treaty, however, provided that the lands described in article 1 were to be surveyed and sold under the direction of the Secretary of the Interior on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws; and under article 2 the lands were to be sold for the benefit of the Indians by the Secretary of the Interior, under such rules and regulations as he might from time to time prescribe, under the direction of the Commissioner of the General Land Office, as other lands are surveyed and sold; and under article 16, in case of the removal of the Indians, the diminished reserve was to be disposed of by the United States in the same manner and for the same purposes as provided in relation to the so-called trust lands. Thus power was given to the Secretary of the Interior, acting through the Commissioner of Public Lands, to make the same rules and regulations for the sale of the treaty lands as applied to the survey and sale of "public lands," and to that end he had power to provide for their sale by the various receivers and registers of the land office in the

State of Kansas, in whose jurisdiction such lands lay. Although the treaty provided the sum of $20,000 to pay the expense of carrying out its provisions, yet it is evident that the purpose of the treaty was that these lands should be sold at the least expense to the Indians in their sale, and we think that the Secretary of the Interior, acting through the Commissioner of the General Land Office, had the right to provide, as was done in this case, that the various registers and receivers should sell the lands and should not receive more than the maximum compensation for their services per annum otherwise allowed by law. In cases where the maximum amount would not be received without resorting to the treaty fund, such resort was permitted, and the fund was in fact resorted to in this case in order to reach the maximum for the fractional years of claimant's service. The Secretary of the Interior having made this rule, and the instructions of December 19, 1867, being in existence when the claimant herein received his appointment as register, he took it subject to the provision that his maximum compensation for all services rendered should not exceed the sum named by law. See sections 2237, 2238, 2240 and 2241, Rev. Stat., prescribing among other things, the compensation of registers and receivers. This compensation the claimant was paid thirty years since, without objection or protest from him that he was entitled to any further payment on account of services in the sales of these treaty lands.

The case of *United States* v. *Brindle,* 110 U. S. 688, does not aid claimant. In that case Brindle was, on the twenty-eighth day of October, 1856, "duly appointed special receiver and superintendent to assist the special commissioner 'to dispose of the Delaware Indian trust lands at Fort Leavenworth, in the Territory of Kansas, under the treaty with the Delaware tribe of Indians. On the eighteenth of February, 1857, he was appointed and commissioned for four years as receiver of public moneys for the district of lands subject to sale at Lecompton, Kansas, and on the fifteenth day of May, 1857, he was duly

appointed as special receiver and superintendent to assist the special commissioner to dispose of the trust lands of the Kaskaskia and Peoria, Piankeshaw and Wea Indians, confederated tribes of Indians at Paoli, Kansas Territory." Brindle was thus appointed special receiver and superintendent of the Delaware Indian trust lands before he was made receiver of public money, and while he was receiver of public money he was duly appointed as special receiver of the other Indian tribes, as above stated. The duties of the positions (special receiver, etc., and receiver of the public moneys) were thus kept separate and apart. As receiver he was to receive public moneys for land subject to sale at Lecompton, Kansas, while his duties in regard to the other positions to which he had been specially appointed referred to the disposition of the Indian lands, in one case at Fort Leavenworth and in the other case at Paoli, both in the Territory of Kansas. This court held that when subsequent to his appointment as receiver of the public moneys Brindle was appointed special receiver and superintendent to assist the special commissioner "in disposing of the trust lands he was employed to render a service in no way connected with the office he held. He was not appointed to any office known to the law. *No new duty was imposed upon him as receiver of the Land Office.* The President was, both by the treaties and the act of 1855, charged with the duty of selling the lands, and under his instructions Brindle was employed to assist in the work. By express provisions in the treaties the expenses incurred by the United States in making the sales were to be paid from the proceeds. This clearly implied the payment of a reasonable compensation for the services of those employed to carry the trust into effect."

In the case at bar the duty had already, prior to claimant's appointment, been imposed on the various receivers and registers as such, of attending to the sale of these lands within their various districts, and express provision had been made that in no case was their compensation to exceed the maximum sum already provided by law. When such provision had been

made in regard to compensation there is no room for any implication of a promise to pay an additional reasonable compensation for the services of such registers and receivers in the sale of those lands. Such implication was specially negatived before the claimant took office. He received his pay under the provision of law already stated, without any protest or claim on his part that he was entitled to anything further or other than the amount he from time to time received. More than thirty years after the last payment, Congress passed the act of March 3, 1903, the thirteenth section of which is contained in the foregoing statement of facts. The passage of the act did not imply any admission that there was anything due the claimant. It simply provided for the presentation of his claim to the court and for a decision on the merits, without assuming to say that he had any claim of a meritorious nature.

We agree with the Court of Claims that the claimant has failed to make out a case, and the judgment dismissing his petition is

*Affirmed.*

MR. JUSTICE MOODY took no part in the decision of this case.