NORTHERN PAC. RY. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   November 6, 1911.)

No. 1,916.

1. BOUNDARIES (§ 3*)—DESCRIPTION—RELATIVE IMPORTANCE OF CONFLICTING ELEMENTS—MOUNTAIN RANGE.

The boundary of the Yakima Indian reservation in Washington, as fixed by Treaty June 9, 1855, art. 2, 12 Stat. 951, was given in part as following the Attah-nam river westward from its mouth where it flows into the Yakima "to the forks; thence along the southern tributary to the Cascade Mountains: thence southerly along the main ridge of said mountains, passing south and east of Mt. Adams to the spur whence flows the waters of the Klickitat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide;  *  *  *"  thence following certain divides to a fixed point on the Yakima. The territory had not been surveyed and but little explored, and its topography was not well known at the time the treaty was made, but the main range of the Cascade Mountains, and especially Mt. Adams, which is in such range, were prominent and well-known landmarks. By a map forwarded to the department by Gov. Stevens, who concluded the treaty, it appears that it was then supposed that the South fork of the Attah-nam river extended westward to the summit of the mountain range, and that the Klickitat river was to the westward of the ridge, but subsequent surveys showed that the Klickitat was east of the main range and the source of the Attah-nam some 15 or 20 miles to the eastward of it.  *Held,* that as the boundary as given was clearly erroneous and its calls could not be reconciled, and the main ridge of the mountains and the spur on the southeast of Mt. Adams, which could be seen for several miles, called for as the western boundary of the reservation, were the most fixed and certain objects, the call for them should prevail over the uncertain calls for the northern and southern boundaries, although it required the northern boundary to be extended several miles westward from the head of the South fork of the Attah-nam river and across the Klickitat and the southern boundary also to cross such river.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

2. PUBLIC LANDS (§ 114*)—SUIT TO CANCEL PATENTS—PRESUMPTIONS.

There is no presumption in favor of a patent to lands issued by the Land Department as against a claim that the land was within an Indian reservation and not subject to disposal as public land.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 114.*]

3. INDIANS (§ 12*)—RESERVATIONS IN GRANTS OF LAND—TITLE AND RIGHTS OF INDIANS.

Lands reserved for the exclusive use and benefit of Indian tribes in a treaty ceding other lands to the United States are held in trust by the government for the sole benefit of such Indians, and their right of occupancy to lands within the legal boundaries of the reservation cannot be affected by an incorrect survey and the patenting to others of the lands thereby excluded.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. INDIANS (§ 12*)—RAILROAD GRANT—CONSTRUCTION—LANDS IN INDIAN RESERVATION.

The grant to the Northern Pacific Railroad Company by Act July 2, 1864, c. 217, § 3, 13 Stat. 367, of alternate sections of public land adjacent to its line, "not reserved, sold, granted, or otherwise appropriated and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed," did not include any lands within the true boundaries of the Yakima Indian reservation in Washington, and patents to certain lands therein, issued under such grant by reason of an erroneous survey of the reservation without the fault, concurrence, or acquiescence of the Indians, are void and subject to cancellation for inadvertence and mistake.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 27, 28; Dec. Dig. § 12.*]

5. INDIANS (§ 27*)—SUITS FOR CANCELLATION OF PATENTS—LIMITATION.

Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), limiting the time for the bringing of suits by the United States to vacate and annul patents to lands to six years after the date of the issuance of such patents, does not apply to suits brought on behalf of Indian tribes to cancel patents issued by mistake for lands within a reservation which were never a part of the public domain subject to disposal by the government.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 27.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Suit in equity by the United States against the Northern Pacific Railway Company, the Mercantile Trust Company, Henry Yeackel and Flora Yeackel, his wife, C. D. Wise and ——— Wise, his wife, and R. D. McCully, to cancel patents to certain lands in the state of Washington. Decree for complainant, and defendants appeal. Affirmed.

On June 9, 1855, a treaty was concluded between the United States and 14 confederated tribes and bands of Indians known as the Yakima Indians, by the terms of which the Indians ceded to the United States a large tract of land in the territory of Washington, reserving out of it, however, for their "use and occupation" a tract of land described by courses and topographical features of the region, as follows:

Commencing on the Yakima river, at the mouth of the Attah-nam river; thence westerly along said Attah-nam river to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mt. Adams, to the spur whence flows the waters of the Klickitat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satas river from those flowing into the Columbia river; thence along said divide to the main Yakima, eight miles below the mouth of the Satas river; and thence up to the Yakima river to the place of beginning.

All of the foregoing tract, the treaty provided, should be "set apart and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes and bands of Indians as an Indian reservation." Article 2. The treaty was ratified March 8, and proclaimed April 18, 1859 (12 Stat. L. 951). On April 30, 1857, Gov. Stevens, who had concluded the treaty, forwarded to the Commissioner of Indian Affairs at Washington a "map of the Indian Nations and tribes of the territory of Washington and of the territory of Nebraska west of the mouth of the Yellowstone." Upon this map appears, among many others, a tracing of the Yakima Indian reservation. An original map, known as the "White Swan Map," and bearing

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the inscription, "I. I. Stevens Map, March, 1857," appears to have been deposited at the Yakima agency, having, it is alleged, been given by Gov. Stevens to an Indian named White Swan. This map shows the boundaries of the Yakima reservation only, and appears to be a reproduction, in part at least, of the tracing of that reservation as it is shown on the larger map transmitted to Washington by Gov. Stevens April 30, 1857.

In 1861, the superintendent of Indian affairs for Washington territory directed Messrs. Berry and Lodge, surveyors, to make a survey of the southern boundary of the reservation. Such a survey appears to have been made in that year, and a map of it was filed in the office of the Commissioner of Indian Affairs.

July 2, 1864, Congress passed an act (13 Stat. L. 365) incorporating the Northern Pacific Railroad Company. By the third section of the act a grant of lands was made to that company in the following terms:

"That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time (of definite location), any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections." Section 3.

The map of definite location of the railroad opposite the lands involved in this suit was filed June 25, 1883, and approved June 28, 1883, and the railroad was duly constructed. All of the lands in question were within the primary limits or the indemnity limits of the grant, and the defendants (appellants here) are entitled to them unless they were reserved by the treaty of 1855.

In 1886, the southern boundary of the reservation for a distance of 47½ miles from the Yakima river appears to have been surveyed by one Harry J. Clark; but the work was poorly done, and all evidences of it were soon lost. And in 1889 the agent at the Yakima agency wrote to the Commissioner of Indian Affairs urging that a resurvey of the southern boundary and an original survey of the western boundary of the reservation be made. The western boundary, he said, ran "along the main ridge of the Cascade Mountains south and east of Mt. Adams"; and he said it was a subject of disagreement as to which was the "main ridge" there referred to, the Indians claiming that the main ridge extended to the base of Mt. Adams on the south and east, while white men with diverse interests claimed that it was farther east. All of the country south and east of Mt. Adams for 40 or 50 miles was regarded as part of the Cascade Range, being wholly mountainous, and therefore, because of this uncertainty, he thought a survey necessary.

As a result of this letter, and with a view to settling the questions suggested in it, the Department, in 1890, closed a contract with George A. Schwartz, United States deputy surveyor, for a "resurvey and survey of the south and west boundary of the Yakima Indian reservation"; and in September, October, and November of that year the survey was completed by him. In July, 1891, the survey thus made was examined by Jacob E. Noel, acting under instruction from the United States Surveyor General for the State of Washington. He reported that great care had been taken by Deputy Surveyor Schwartz in establishing the lines, and that the work had been

carefully and skillfully done. On receipt of the returns of the survey, together with Mr. Noel's report thereon, it was accepted by the Commissioner of the General Land Office October 21, 1891.

The instructions of the United States Surveyor General for the State of Washington under which this Schwartz survey was made required that the boundary line should be run commencing at a point on the south bank of the Yakima river at the southeastern corner of the reservation, and running thence westward 47½ miles along the southern boundary of the reservation. This survey as directed to be made was run in a direction reverse to that of the calls of the treaty, and, so far as material to the question under consideration, the instructions were as follows:

"From the 47½ milepost, the line to be surveyed extends along the divide separating the waters of the Satas from those flowing into the Columbia, 'to the divide' between the waters of the Klickitat and Pisco rivers; thence along said divide to 'the spur whence flow the waters of said' rivers; thence up said spur to the main 'ridge of the Cascade Mountains; thence' northerly along said ridge, passing south and east of Mt. Adams, 'to the southern tributary of the Attah-nam river'—to the established corner of fractional sections 6 and 31, on the south boundary of township 12 north, range 15 east, Willamette meridian. According to the statement of the agent in charge of the Yakima agency: 'The question as to which is the main ridge of the Cascade Mountains referred to in the treaty is a subject of disagreement; the Indians claiming that the main ridge extends to the base of Mt. Adams on the south and east, and white men with diverse interests claiming the said ridge to be further east.' Also: 'That no river known as the Pisco is shown on any map, and that he has found no person, white or Indian, who has knowledge of any river of that name. That the river designated as the "Toppenish" on the map of 1887 is the Pisco referred to in the treaty. It is delineated on the diagram as rising about six miles nearly due east of Mt. Adams and a very short distance north of the second standard parallel.'

"It is therefore advisable that, before you proceed to definitely locate and extend the boundary of the reservation from the 47½ milepost, you confer with the agent in charge of the Yakima agency, and with other white persons, and Indians, familiar with the country, and obtain all the information possible that will tend to a proper location and establishment of this section of the boundary line according to the provisions of the treaty of June 9, 1855."

The field notes of this survey from the forty-seventh milepost to the one-hundredth milepost are in the record. In the general description of the survey the surveyor makes the following report:

"Up to the fifty-first mile corner there is no disagreement whatever regarding the location of the line, that I could learn. The line follows the top of a well-defined ridge acknowledged to be the true divide by both the whites and Indians with whom I conversed. The line in dispute is from the fifty-first mile 'onward' in a northerly direction. The Indians claim that the line passes along the top of a low ridge of hills bearing in a southwesterly direction and terminates at the Big Klickitat river, and that this should be a continuation of their southern boundary; upon the western end of said ridge there is a round hill called Grayback Mountain.

"Thence it is claimed by the Indians the line bears in a northwesterly direction crossing the Klickitat river to the base of Mt. Adams.

"From a consultation with Mr. Stabler, the United States Indian agent at Ft. Simcoe, and from our understanding of the description of this boundary as given in the treaty of June, 1855 (U. S. Stats. vol. 12, p. 951), I adopt this as the intended course and continue the line along top of the divide which bears in a northerly direction between the waters of the Satas and those flowing into the Klickitat river, passing through a country heavily timbered with first-class yellow pine; the land is chiefly valuable for its timber and grazing, being too dry and the soil too sandy for profitable agriculture.

"At the seventy-seventh mile corner begin to ascend the Simcoe Mountains whence flows the Pisco or Topinish river. All the Indians with whom I have talked concerning the boundary said that stream now known as the 'Topinish' was in former times called 'Pisco.' Said stream flows east into the Satas which emptied into the Yakima river a few miles below its confluence.

"Thence I ran in a northerly direction along top of High mountain which is the divide between the Klickitat and the waters flowing into the Yakima river and is not the main range of the Cascade Mountains which cannot be reached without crossing the Klickitat river.

"I followed said divide to a low saddle where the southern tributary of the Attah-nam heads and also a tributary of the Klickitat which flows west."

In 1895 and 1896, patents were issued to the Northern Pacific Railroad Company for a large part of the lands involved in this suit. In the year 1896, the Northern Pacific Railway Company, a corporation organized under the laws of Wisconsin, purchased at foreclosure sale the patented lands of the railroad company, and the rights of that company to receive lands not yet patented. The remaining patents were issued directly to the railway company in 1904, pursuant to the rights thus acquired at the foreclosure sale.

In 1898 question was again raised as to what were the true boundaries of the reservation and as to whether the Schwartz survey had correctly defined them; and in 1899 E. C. Barnard, then a topographer of the geological survey, acting under the direction of the Secretary of the Interior, visited the reservation, and after examination submitted, on January 12, 1900, a report and map marking out the boundaries of the reservation, as he conceived they ought to be marked out. The maps attached to this report were the old White Swan Map referred to above; and a map made by Barnard himself, in which the boundaries of the reservation as defined by Schwartz in 1890, and these boundaries as Barnard thought they ought to be, are shown.

The annexed sketch exhibits the general outline of the reservation and the lines of the Schwartz and Barnard surveys of the western boundary as shown on that map:

On April 20, 1900, the Secretary of the Interior transmitted Barnard's report to the Speaker of the House of Representatives with a draft of a bill granting authority for the detail of an Indian inspector to negotiate an agreement with the Indians for an adjustment of their claim to the lands lying without the Schwartz but within the Barnard line of the reservation; and subsequently Congress passed an act, approved December 21, 1904 (33 Stat. at L. 595, c. 22), section 1 of which reads as follows:

"That the Secretary of the Interior be, and he is hereby authorized and directed, as hereinafter provided, to sell or dispose of unallotted lands embraced in the Yakima Indian reservation proper, in the state of Washington, set aside and established by treaty with the Yakima Nation of Indians, dated June eighth, eighteen hundred and fifty-five: Provided, that the claim of said Indians to the tract of land adjoining their present reservation on the west, excluded by erroneous boundary survey and containing approximately two hundred and ninety-three thousand eight hundred and thirty-seven acres, according to the findings, after examination of Mr. E. C. Barnard, topographer of the geological survey, approved by the Secretary of the Interior April seventh, nineteen hundred, is hereby recognized, and the said tract shall be regarded as a part of the Yakima Indian reservation for the purposes of this act; provided further, that where valid rights have been acquired prior to March fifth, nineteen hundred and four, to lands within said tract by bona fide settlers or purchasers under the public land laws, such rights shall not be abridged, and any claim of said Indians to these lands is hereby declared to be fully compensated for by the expenditure of money heretofore made for their benefit and in the construction of irrigation works on the Yakima Indian reservation."

The lines of the Barnard survey here recognized and regarded as describing the western boundary of the reservation inclose 293,837 acres lying outside the boundary of the Schwartz survey. The lands here in question lie within this area, that is to say, without the lines of the reservation as surveyed by Schwartz, but within those lines as marked out by Barnard. After the passage of the act of December 21, 1904, the government demanded of the railway company that it reconvey them, and, a reconveyance being refused, this suit was begun, resulting in a decree directing cancellation of the patents.

In the act of Congress of February 22, 1889 (25 Stat. 676, 679, c. 180), admitting certain territories including the territory of Washington into the Union, it was provided that upon the admission of the proposed states sections 16 and 36 of every township should be granted to the states respectively for the support of common schools.

In the above-mentioned act of December 21, 1904, it was provided that where valid rights had been acquired prior to March 5, 1904, to lands within the tract included within the lines of the Barnard survey, and without the lines of the Schwartz survey, by bona fide settlers or purchasers under the public land laws, such rights should not be abridged; but it appears that the Land Office at Washington has held that the state of Washington was not a bona fide purchaser of lands included in such tract within the meaning of the act and has also held that, as the state could select other lands in lieu of the lands so selected within such tract, it could be in no way injured by the loss, and accordingly the Land Department has refused to recognize the right of the state to lands within the tract in controversy. The state of Washington, seeking to protect its interest in this tract of land, has applied for and obtained leave to file a brief in this case by its Attorney General, in which it is represented that the proclamations of the President creating forest reserves in the state of Washington include 12,000,000 acres of land within the state, and that, while the act of December 21, 1904, permits the state to select other lands in place of those lost to the state by reason of the adoption of the Barnard survey of the reservation, the fact is that the state is prevented from making such selections by the establishment of the forest reservations which have included all the land of any value remaining in the public domain within the state. This loss of the state by the Barnard survey and by the action of the Land Department is said to be 23,138.79 acres.

The court below entered a decree in favor of the United States upon the authority and validity of the Barnard survey. The defendants have brought the case here on appeal.

Charles W. Bunn, Charles Donnelly, and Edward J. Cannon, for appellants.

Oscar Cain, U. S. Atty., and E. C. Macdonald, Asst. U. S. Atty. W. P. Bell, Atty. Gen., for the State of Washington.

Before GILBERT and MORROW, Circuit Judges, and WOL-VERTON, District Judge.

MORROW, Circuit Judge (after stating the facts as above). [1] The question to be determined in this case is the westerly boundary of the Yakima Indian reservation as described in the treaty of June 5, 1855 (12 Stat. 952).

It will be convenient to repeat the description contained in the treaty, identifying its calls by numbers as follows:

(1) Commencing on the Yakima river, at the mouth of the Attahnam river.

(2) Thence westerly along said Attah-nam river to the forks.

(3) Thence along the southern tributary to the Cascade Mountains.

(4) Thence southerly along the main ridge of said mountains, passing south and east of Mt. Adams, to the spur whence flows the waters of the Klickitat and Pisco rivers.

(5) Thence down said spur to the divide between the waters of said rivers.

(6) Thence along said divide to the divide separating the waters of the Satas river from those flowing into the Columbia river.

(7) Thence along said divide to the main Yakima, eight miles below the mouth of the Satas river.

(8) And thence up the Yakima river to the place of beginning.

There is no controversy as to the location of the point "commencing on the Yakima river, at the mouth of the Attah-nam river," nor is there any controversy as to the second call, "westerly along said Attah-nam river to the forks," nor as to the third call, "along the southern tributary"; but the controversy begins with the terminal point of this call, "the Cascade Mountains."

The call is limited by the Schwartz survey to the southern boundary of the Attah-nam river and terminates where that tributary takes its rise in a range of the Cascade Mountains. But it is now known that this is not the main range of the Cascade Mountains, and that the southern tributary of the Attah-nam river does not take its rise in that range. In the general description of his survey Schwartz reported that this range along which he ran the western boundary of the reservation "is not the main range of the Cascade Mountains." His instructions were that the western boundary line coming up from the south should be "the main ridge of the Cascade Mountains, thence northerly along said ridge, passing south and east of Mt. Adams, to the southern tributary of the Attah-nam river." He was further instructed that the question as to which was the main ridge of the Cascade Mountains referred to in the treaty was a subject of disagree-

ment; the Indians claiming that the main ridge extended to the base of Mt. Adams on the south and east, and white men with diverse interests claiming the said ridge to be further east. He was further instructed:

"It is therefore advisable that before you proceed to definitely locate and extend the boundary of the reservation from the 47½ milepost, you confer with the agent in charge of the Yakima agency, and with other white persons, and Indians, familiar with the country, and obtain all the information possible that will tend to a proper location and establishment of this section of the boundary line according to the provisions of the treaty of June 9, 1855."

Schwartz appears to have consulted with the Indian agent in charge of the Yakima agency, and with other white persons and Indians, and found and identified the main ridge of the Cascade Mountains. But he did not carry his survey along that ridge, as instructed, but along a ridge 15 to 20 miles further east. His reason for running his line along the eastern ridge instead of the main ridge to the west was that the former was a ridge dividing the waters of the Satas and Klickitat rivers, and along which he could carry his line to the source of the southern tributary of the Attah-nam river "without crossing the Klickitat river, and the treaty did not call for that." But his instructions did not require him to follow that ridge or to avoid crossing the Klickitat river. On the contrary, he was instructed to ascertain and follow the main ridge of the Cascade Mountains. Nor did any call of the treaty require him to follow the ridge dividing the waters of the Satas and Kickitat rivers.

This brings us to the consideration of one of the controlling questions in this case. Between the main ridge of the Cascade Mountains, along which the fourth call of the treaty locates the western boundary and the apparent terminal point of the third call of the treaty at the source of the Attah-nam river in the Cascade Mountains, there is a gap of 15 to 20 miles; that is to say, the third call of the treaty following the southern tributary of the Attah-nam river does not reach the main ridge of the Cascade Mountains, but appears to terminate in an inferior eastern ridge of the Cascade Mountains. Between that ridge and the summit of the main ridge there is a distance of from 15 to 20 miles, and a straight line between these two points leaves the eastern ridge and crosses the headwaters of the Klickitat river to the main or western ridge. Is this gap in the description of the treaty boundary of such a character as to defeat the western boundary along the main ridge of the Cascade Mountains? We think not. Gov. Stevens, who negotiated the treaty with the Indians, had a map made in 1857, two years after the making of the treaty and two years before its ratification, showing the location of the Indian nations and tribes of the territory of Washington and the territory of Nebraska west of the mouth of the Yellowstone. On this map is a tracing of the Yakima Indian reservation which clearly carries the western boundary of the reservation to and southerly along the main ridge of the Cascade Mountains, passing south and east of Mt. Adams as required in the fourth call of the treaty. The map is, however, incorrect, in this, that it appears to locate the rise of the southern tributary of the Attah-nam river in the main ridge of the Cascade Mountains. There is in

the record a copy of another map, the original of which is said to have been deposited at the Yakima agency, having, it is alleged, been given by Gov. Stevens to an Indian named White Swan; hence the map is named the "White Swan Map." This map shows the boundaries of the Yakima reservation and appears to be a reproduction, in part at least, of the tracing of that reservation as it is shown on the larger map and transmitted to Washington by Gov. Stevens in 1857. On this map the northern boundary of the reservation follows the southern tributary of the Attah-nam river to a point manifestly on the main ridge of the Cascade Mountains, thence southerly along the main ridge for a short distance, when the boundary turns eastwardly passing south and east of Mt. Adams.

The error in these maps in locating the head or source of the southern tributary of the Attah-nam river in the main ridge of the Cascade Mountains is not difficult of explanation. The Cascade Mountains is a range of considerable length and elevation, extending north and south through Oregon, Washington, and British Columbia, and running nearly parallel to the Pacific Coast line. In the state of Washington this range forms an elevated plateau with a general elevation of from 5,000 to 7,000 feet, rising into a rugged and complex order of ridges and peaks from 50 to 100 miles in width. Along the main axis of the range are a number of high peaks, among others Mt. Adams, with an elevation of 12,325 feet. This mountain with its connecting ridge and spurs is a prominent feature in the landscape, and would be a natural monument, and the connecting main ridge of the Cascade Mountains a natural boundary for such a large tract of land as the Yakima Indian reservation described in the treaty of 1855. But at the time this treaty was made the country had not been fully explored, the approaches to this main ridge by water courses had not been definitely located, and the topography of the country was not accurately known. Mr. Barnard in his report dated January 12, 1900, concerning the disputed western boundary line of the reservation, says:

"From the imperfect topographical knowledge of the country it was believed that both the Atanum and Pisco rivers reached the summit of the Cascade Mountains, but such is not the case although from a distance it would be a fair presumption."

With the information available to Gov. Stevens he supposed the source of the Attah-nam river to be in the main ridge of the Cascade Mountains, and he so placed it upon his map. Now, while this has since been discovered to be a mistake, the fact remains that he located the western boundary of the reservation on the main ridge of the Cascade Mountains, and as this is the most certain and material call of the description it should prevail. This is in accordance with the general rule that has been adopted by the courts for solving such a question.

In Newsom v. Pryor, 7 Wheat. 7, 5 L. Ed. 382, the Supreme Court of the United States had before it a similar question, and the opinion of the court, delivered by Mr. Chief Justice Marshall, is peculiarly applicable to the facts in the present case. He says:

"In consequence of returning plats, where no actual surveys had been made, and where the country had been very imperfectly explored, the description

contained in the patent often varies materially from the actual appearance of the land intended to be acquired. Natural objects are called for, in places where they are not to be found; and the same objects are found, where the surveyor did not, suppose them to be. In a country of a tolerably regular surface, no considerable inconvenience will result from this circumstance. The course and distance of the patent will satisfy the person claiming under it, and seldom interfere with the rights of others. But in a country where we find considerable water courses and mountains, there must be more difficulty. The surveyor calls for some known object, but totally miscalculates its courses, distances, or both, from some given point which he has made the beginning of his survey; and there is a variance in the different calls of his survey. and of the patent founded on it.. As in this case, the second line is to run south 894 poles, to a stake, crossing the river. This distance will not reach the river, and must be continued to 1,222 poles, to cross the river. The distance must be disregarded, and this line so extended as to cross the river, or the distance must control the call for crossing the river.

"These difficulties have occurred frequently, and must be expected to occur frequently, where grants are made without an actual survey. Some general rule of construction must be adopted; and that rule must be observed, or the conflicting claims of individuals must remain forever uncertain. The courts of Tennessee, and all other courts by whom causes of this description have been decided, have adopted the same principle, and have adhered to it. It is that the most material and most certain calls shall control those which are less material, and less certain. A call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance."

Under this rule distance must be disregarded and the more material and certain call accepted.

But it is contended by the appellant that the Barnard survey recognized by Congress in the Act of December 21, 1904, as locating the boundaries of the reservation in accordance with the treaty of June 9, 1855, and followed by the court below in its decree, is purely arbitrary; that the lines so recognized and adopted do not follow the treaty calls from the head of the south fork of the Attah-nam river, but, on the contrary, it is contended they are in direct collision with such calls. This objection is based upon the claim that by the fourth call the line from the point where the Cascade Mountains were reached was to run southerly along the mountains and divides separating the waters of the Klickitat and Pisco rivers. The language of the fourth call is as follows: .

"Thence southerly, along the main ridge of said mountains, passing south . and east of Mt. Adams to the spur whence flow the waters of the Klickitat and Pisco rivers."

If we are correct in our opinion that the topography of the country was not definitely known or correctly understood by the framers of the treaty, this objection is without any serious force, if, indeed, it is not completely answered by the fact that on the Stevens map the Klickitat river is shown as taking its rise on the west side of the main Cascade Range and flows south on the west side of Mt. Adams, while the Pisco is there shown on the east side, and according to Barnard's report it was believed that it reached the summit of the Cascade Mountains. If this was the information possessed by the framers of the treaty and in accordance with that information they were running this call southerly passing south and east of Mt. Adams to a spur on that mountain, then the Barnard survey locates the fourth call of the

western boundary in accordance with the understanding and intention of the parties to the treaty.

The United States might object to the Barnard survey on the ground that it does not in fact reach the ridge of the Cascade Mountains for a beginning of the fourth call, but starts on a ridge a little to the east of the main ridge. As this feature of the boundary does not, however, affect any of the land in suit and the objection is not made, we do not stop to discuss that question.

The fourth call of the treaty terminates, as we have said, on a spur of Mt. Adams which has been reached by a line passing south and east of the mountain. Mt. Adams is a prominent peak in that region and a monument easily identified, and a spur on the southeast side would also be easily identified, and the evidence appears to support that conclusion.

In Barnard's report he says:

"The testimony of the Indians, Chief Spencer, and Stick Joe, given in the report of last year, is repeated below:

"'Stick Joe said that in or about 1860 he accompanied a party along a portion of the southern boundary. They left the old military road at milepost 29; this being the point where the reservation line crosses the same. They then proceeded on the line which follows a well-defined ridge to a peak called Grayback, on the summit of which a marked wooden post set in the ground was found. At this point the surveyor, agent, or officer accompanying the party took out a telescope or some surveying instrument, and, sighting toward Mt. Adams, pointed out a conical hump on the southeast slope of the same, told the party that the line now went straight to that point.'

\* \* \*

"The above description of the route followed was given in a graphical way, with gestures that lead me to believe it was an actual experience.

"Chief Spencer, on being asked to tell what he knew of the boundary line of the reserve, said that Gov. Geary, who succeeded Gov. Stevens, described the limits of the reserve to him as follows:

"'Up the Atanum river from its mouth to the mouth of the South fork; thence up the South fork to the head; thence directly west across the Little Klickitat to a high point just this side of Goat Rocks; thence to a conical hump on the southeast slope of Mt. Adams.'"

Barnard in commenting upon this call of the boundary says:

"This ridge is well defined for a considerable distance toward Mt. Adams, when it becomes lower and flattens out and the line might swing around the eastern slope to reach the conical hump described by Stick Joe, which is a well-defined point easily recognized, 7.500 feet high, or it might reach the conical hump by passing over the summit of Mt. Adams. The boundary line would then continue in a straight line to Grayback Peak."

The Schwartz survey does not pretend to reach Mt. Adams or any spur of that mountain, but turns aside at the fifty-first milepost and proceeds northerly to avoid crossing the Klickitat river. We think the superior monument of Mt. Adams should prevail here as the more certain call of the main ridge of the Cascade Mountains in the third call, and for the same reasons.

The fifth call of the treaty is as follows:

"Thence down said spur to the divide between the waters of said river."

And the sixth call continues:

"Thence along said divide to the divide separating the waters of the Satas river from those flowing into the Columbia river."

The last call carries the boundary to, and perhaps beyond, the fifty-first milepost mentioned in the Schwartz survey, where the controversy ends.

If we are correct in following the language of the treaty and locating the western boundary of the reservation along the main ridge of the Cascade Mountains to a spur of Mt. Adams, reached by passing south and east of that mountain, then the Barnard survey must be accepted as properly locating the fifth and sixth calls, and the objection that the divide mentioned in these two calls is not continuous and is broken by the crossing of the Klickitat river and its tributaries yields, as in the fourth call, to the superior calls of Mt. Adams and the main ridge of the Cascade Mountains.

[2] It is next contended that, if there is a doubt as to the location of the boundaries called for by the treaty, that doubt should be resolved in favor of the patents issued to the Northern Pacific Railway Company and its predecessor in interest. We do not admit that there is any doubt as to the proper location of the western boundary of this reservation; but, assuming that there is, the rule which resolves such a doubt in favor of the patent issued by the United States does not obtain in this case.

[3] The United States brings this action for itself and on behalf of the Indians as their trustee and guardian. The Yakima Indian reservation is a tract of land reserved by the Indians out of a much larger tract claimed and occupied by them prior to 1855, and which larger tract they ceded and conveyed to the United States with an agreement with respect to the reserved tract that it should be "set apart and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes and bands of Indians as an Indian reservation."

The United States owed the duty of trustee and guardian to preserve the rights of the Indians in the tract reserved, and by the treaty it agreed to survey the boundaries of the reservation, and set it apart for the exclusive use and benefit of the Indians. It could not therefore by an incorrect survey deprive the Indians of their right of occupation of the land within the legal boundaries of the reservation as established by the treaty. This is the general and well-established law of trust and guardianship in support of which authorities need not be cited. The law has been applied to controversies relating to lands occupied by the Indians in the broadest terms.

In Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, the railroad company claimed title to certain lands within the Osage country in Kansas. These lands had been certified by the Commissioner of the General Land Office upon the approval of the Secretary of the Interior, and by such certificate conveyed to the Governor of Kansas as forming part of a grant made by Congress in 1863 to the state to aid in the construction of certain railroads. Act March 3, 1863, c. 98, 12 Stat. 772. The lands were conveyed by the Governor by patent to the railroad company. At the time of the grant by Congress to the state of Kansas the lands were occupied by the Osage Indians, but subsequently the Indians conveyed these

lands by treaty stipulation to the United States. It was contended by the United States, in support of its suit to establish title to these lands, that Congress had not disposed of the Osage lands by the act of 1863, and had not intended to do so. The railroad company contended that, although the grant did not operate upon any specific tracts until the railroad was located, it then took effect upon those in controversy, as, by reason of the extinction of the Osage title, the lands had become, in the proper sense of the term, public lands. The Supreme Court denied the contention of the railroad company and held that:

"The Indians are acknowledged to have the unquestionable right to the lands they occupy, until it shall be extinguished by a voluntary cession to the government, and   *   *   *   that right was declared to be as sacred as the title of the United States to the fee."

It was also held in that case that:

"As the transfer of any part of an Indian reservation secured by treaty would also involve a gross breach of the public faith, the presumption is conclusive that Congress never meant to grant it."

It was further said that:

"Only the public lands owned absolutely by the United States are subject to survey and division into sections, and to them alone this grant is applicable. It embraces such as could be sold and enjoyed, and not those which the Indians, pursuant to treaty stipulation, were left free to occupy."

In the late case of Stewart v. United States, 206 U. S. 185, 27 Sup. Ct. 631, 51 L. Ed. 1017, referring to the sale of these lands under the treaty with the Osage Indians, the Supreme Court said:

"Except for the treaty between the United States and the Osage Indians, relative to the lands in question, and the passage of appropriate legislation by the United States, the lands would never have been sold, as they were not public lands of the United States for the sale of which Congress had already provided under its general legislation."

In Minnesota v. Hitchcock, 185 U. S. 373, 389, 22 Sup. Ct. 650, 656 (46 L. Ed. 954), the Supreme Court held that:

"The Indian's right of occupancy has always been held to be sacred; something not to be taken from him except by his consent, and then upon such consideration as should be agreed upon."

[4] The Indian's right of occupancy to the entire tract within the boundaries of the reservation as described by the treaty of 1855 had not been extinguished by the United States, at the time of the grant of lands to the Northern Pacific Railroad Company by the Act of July 2, 1864 (13 Stat. 365). That act granted certain sections of land on the line of the road to which the United States had "full title" and which had not been "reserved, sold, granted, or otherwise appropriated and free from pre-emption or other claims or rights at the time the line of said road was definitely fixed and a plat thereof filed in the office of the Commissioner of the General Land Office." To the lands between the Schwartz and Barnard surveys the Indians had a "right of occupancy" which, by the express terms of the grant to the railroad company, excluded it from that grant, and the officers

of the Land Department were without authority to issue patents to the railroad company for any of the lands within the reservation. Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 739, 23 L. Ed. 634. The patents so issued were therefore issued by the Land Department through inadvertence and mistake and without the fault, concurrence, or acquiescence of the Indians, or the United States, their guardian and trustee, and should be canceled.

[5] The appellants claim that they were bona fide purchasers, and as such entitled to protection under the Act of March 2, 1896, c. 39, 29 Stat. 42 (U. S. Comp. St. 1901, p. 1603); and that under section 8 of the Act of March 3, 1891, c. 561, 26 Stat. 1095, 1099 (U. S. Comp. St. 1901, p. 1521), the statute as to all patents issued more than six years prior to the commencement of the action was barred. In our opinion these statutes relate to patents issued for lands within the public domain, and the contention of the appellants is answered by the conclusion we have reached—that the lands within the Yakima Indian reservation had never been a part of the public domain, and never subject to grant or sale under any statute providing for the disposal of the public lands of the United States.

In the court below the deposition of the author of the Barnard survey was taken on behalf of the United States. He identified the lands mentioned in the bill of complaint as being within the reservation, with certain exceptions, which he said he could only determine upon field examination. In the decree these excepted lands were excluded from its operation, and we think correctly, upon the evidence before the court.

The decree of the Circuit Court is affirmed.