Peelle, Ch. J.,
dissenting:
When this case was originally argued I was in doubt as to the claimants’ right to recover, but yielded to the judgment of the majority. Since the argument of the motion for a new trial I am in still greater doubt, and therefore dissent from the action of the majority of the court in overruling the motion for a new trial.
Without analyzing the various treaties and r •; of Congress — referred to and commented on in the opinion of the court — dealing with the Chippewa Indians, of which the claimant band is a part, my reasons for dissenting are briefly these: The jurisdictional act confers upon the court authority to “ hear and determine ” the suit of the claimant Indians “ on account of losses sustained by them or the Chip *463 pewas of Minnesota by reason of the opening of the Mille Lac Beservation in the State of Minnesota, embracing about 61,000 acres of land, to public settlement under the general land laws of the United States.”
The act does not create a claim, nor does it perform any office except to give the Indians a forum in which to determine their suit on account of losses sustained as aforesaid. (Stewart v. United States, 206 U. S., 185; Sac and Fox Indians, 220 U. S., 481.)
The lands here in controversy, with others, were by article 1 of the treaty of 1864 (13 Stat. L., 693) ceded to the United States in consideration of certain lands set apart by article 2 to six bands of Chippewas in common, including the claimant band, and of moneys paid and to be paid them, as shown in articles 3 to 11 of said treaty, in which consideration the •claimants herein shared on equal terms with all other Indians parties to the treaty. And in addition thereto, for their peaceful conduct (in compliance with former treaties to keep the peace) during the Sioux outbreak in 1862 they were, by the proviso to article 12 of the treaty (1864), permitted to continue their occupancy of the lands so ceded “ so long as they shall not in any way interfere with or in any manner molest the persons and property of the whites.” At most, this was a naked right of occupancy, and this is the only right of which the claimants were deprived by opening the lands to settlement under the public-land laws of the United States.
After the treaty of 1864 the lands here in controversy were surveyed, and as early as 1811 entries thereon had been made, and up to 1884, though the Secretary of the Interior had forbidden entries, more than 55,000 acres of the tract had been entered and patents, though withheld, had been issued for over 7,000 acres.
By reason of adverse rulings by various Secretaries of the Interior respecting the rights of these entrymen all entries were suspended to await the action of Congress. Congress, by the act of July 4, 1884 (23 Stat. L., 76, 98), provided in substance that none of the lands should be patented or disposed of in any manner until further legislation by Con *464 gress. This act operated to suspend all entries theretofore made until the act of January 14, 1889 (25 Stat. L., 642); which was passed, as expressed in the title, “ For the relief and civilization of the Chippewa Indians of the State of Minnesota.” Pursuant to this act said Indians, by agreement with the commissioners appointed thereunder by the President, ceded all their interest in and to the reservations so set apart to them in common with such other Indians by article 2 of the treaty of 1864, in consideration of sharing with all said Indians in the proceeds of the timber and surplus lands and'allotments as in said act provided; and in respect "to the lands here in controversy, as the claimant Indians were, by the proviso, permitted to continue to occupy same by the grace of the Government they were required not to cede but to relinquish their right of occupancy. This was authorized by the act.
In January, 1891, the Secretary of the Interior (Noble) rendered a decision in the case of Walters et al. (12 L. D., 52), holding that the act of 1889 was the further legislation contemplated by the act of 1884, and therefore all entries theretofore suspended were validated; and he directed that if otherwise regular and valid such entries should proceed to patent; that is to say, that prior to the act of 1889 the claimant Indians were, by virtue of the proviso to article 12 of the treaty of 1864, entitled to the use and occupation of the lands (Northern Pacific Railway Co. v. Walters, 13 L. D., 230), but not thereafter.
Congress, by the ..joint resolution of December 19, 1893 (28 Stat. L.,'576), approved the ruling of the Secretary of the Interior holding that the entries made thereon were valid and authorized the issuance of patents therefor; and later, by the act of May 27, 1898 (30 Stat. L., 745), Congress declared all lands so occupied by the claimant band subject to entry, followed by the act of May 27, 1902 (32 Stat. L., 268), appropriating $40,000 to pay the claimant Indians for their improvements on said lands, on condition of their removal therefrom, granting them, however, the privilege of making their allotments on the lands so occupied or on the White Earth ^Reservation at their election.
*465 • But it is contended by the claimants that the cession by article 1 of the treaty (1864) by all the Chippewas of the Mississippi was defeated as to the claimant Indians by the proviso to article 12, which they contend operated to set apart to the claimant Indians the lands* so ceded as a reservation for their occupancy “ so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites ”; and never having broken the conditions, they were unlawfully deprived of the lands. But, conceding this to be true, the authority of Congress over the tribal property of Indians, as has been held by the Supreme Court in many cases, is plenary, and courts “ must presume that Congress acted in perfect good faith in their dealings with the Indians.” Therefore courts can not inquire into the wisdom of such legislation, even though some rights may thereby be taken away. (Worcester v. Georgia, 6 Pet., 515; Stephens v. Cherokee Nation, 114, 445; Lone Wolf v. Hitchcock, 187 U. S., 553, 565.)
There can be no question but that the lands here in controversy were ceded to the United States by article 1 of the treaty of 1864, and the Indian title was- thereby extinguished, the lands paid for, and the claimant Indians, independent of their occupancy of the lands here in controversy, were placed on equal terms with all other Chippewas parties to the treaty of 1864.
In the case of the Fond du Lac Indians (34 C. Cls., 426) the question turned on the acceptance by the Indians of the terms and provisions of the act of 1889, whereby they were permitted to share in the proceeds of nearly 4,000,000 acres of land in addition to the lands set apart to them in severalty. The claimants herein, independent of their right of occupancy of the lands here in controversy, were given equal rights in and to the lands and timber so to be sold.
The jurisdictional act requires us to hear and determine what losses the Chippewa Indians sustained, if any, “by reason of the opening of the Mille Lac Reservation * * * to settlement under the general land laws of the United States.”
*466 What loss have the claimant Indians sustained by reason of opening the lands to public settlement except their right of occupancy, the value of which is not shown, nor is it claimed in this action except as such occupancy is connected with the value of the lands or the timber thereon. But, of course, the Indians had no right to dispose of the lands so occupied, or to sell the timber therefrom for their own benefit, so that any loss which they may have sustained arises, if at all, not under the provisions of any treaty, but alone under the act of 1889.
Section 4 of this act provides in substance that as soon as the cession and relinquishment of the Indian title shall have been obtained the Commisioner of the General Land Office shall “ cause the lands so ceded to the United States to be surveyed.” No provision is there made for the survey of the lands the occupancy of which was alone relinquished by the claimant Indians. The act clearly makes a distinction between the cession of the Indian title to the reservation set apart to them by article 2 of the treaty of 1864 and the relinquishment by the claimants of their right of occupancy to the lands here in controversjL The lands so relinquished were not offered for sale under said act, as were the lands so ceded; and this may be taken as a construction of the act by the officers of the Government charged with its execution, especially when coupled with the entries of nearly all the lands involved herein under the public-land laws of the United States prior to the passage of the act of 1889 and the subsequent ratification thereof by act of Congress, as herein-before stated.
It is manifest that a recovery in this case amounts to double payment for the lands, in addition to the peaceful occupancy thereof by the claimant Indians for a period of about 25 years. That is to say, the consideration expressed in the treaty of 1864 was for the cession of the six reservations set apart to the Chippewas of the Mississippi by clause 2 of article 2 of the treaty of 1855, of which the reservation here involved was one; and that consideration, be it remembered, was not diminished by the proviso permitting the claimant Indians to continue their occupation of the lands. If not, then any judgment rendered herein for the value of the *467 lands or the timber thereon would, of necessity, be additional to the consideration therefor under the treaty of 1864. This I do not believe was contemplated by Congress by the act of 1889; and, if not, then the jurisdictional act has nothing upon which to operate.
The situation is not relieved by awarding judgment in favor of the claimant Indians and decreeing that the proceeds thereof be shared in common by all the other Chippewas of the Mississippi, since such other Chippewas are not parties to this action, nor were they given any right of occupancy by the grace of the Government by the proviso to article 12. That right was given to the claimant Indians alone, and it is a denial of that right in opening the lands to settlement under the public-land laws that gives rise to this action.
The intent of Congress by the appropriation to pay for the improvements, and the approval of the ruling of the Secretary of the Interior holding the entries made on the lands in controversy as valid must be construed by the court as a legislative construction of the act of 1889 excluding the lands here in controversy from the provisions thereof. This certainly was the view of the executive officers in disposing of the other lands and timber after their classification under the act of 1889, in which the lands here in controversy were not included.
In my view of the case the action of Congress with respect to the claimant Indians, coupled with the ruling of the Interior Department, so approved by Congress, is final, and, thus believing, I think the jurisdictional act should be construed in harmony therewith.
For these reasons, I think, the motion for a new trial should be allowed and the petition dismissed.